**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH C. RAMIREZ, a/k/a Joe
Ramirez,

*Plaintiff-Appellant,*

v.

CITY OF BUENA PARK; PEDRO
MONTEZ; FRANK HORNUNG, e/s/a
Hank Hornung; MARC ODOM,

*Defendants-Appellees.*

No. 04-56832

D.C. No.
CV-03-01754-GLT

OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
December 8, 2006—Pasadena, California

Filed March 25, 2009

Before: Alex Kozinski, Chief Judge, Melvin Brunetti and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Brunetti

## COUNSEL

E. Thomas Barham, Jr. and Shirley A. Ostrow, Law Offices of Barham and Ostrow, Los Alamitos, California, for the plaintiff-appellant.

Mitchell E. Abbott, Michael P. Coyne, and Robert C. Ceccon, Richards, Watson, & Gershon, Los Angeles, California, for the defendants-appellees.

## OPINION

BRUNETTI, Circuit Judge:

On May 2, 2003, Officer Pedro Montez of the Buena Park Police Department noticed a car parked outside a drugstore. Montez observed Joseph C. Ramirez in the car's driver's seat, apparently asleep at the wheel. Montez subsequently detained, searched, and arrested Ramirez for being under the influence of a controlled substance. Montez and two other officers then impounded Ramirez's car for its safekeeping. Montez issued Ramirez a citation and released him on his own recognizance after performing additional tests (including a blood test) at the police station. The blood test later came back negative and no charges were filed.

Ramirez filed the present 42 U.S.C. § 1983 action against Montez seeking damages for the detention, search, arrest, and blood test, and against Montez and the other two officers for the impoundment of his car. Ramirez also included a *Monell*

claim against Buena Park for the impoundment of his car, and five state law claims against the defendants.

The defendants filed a motion for summary judgment and Ramirez filed a partial motion for summary judgment. The district court granted the defendants' motion on Ramirez's section 1983 and state law claims, and denied Ramirez's partial motion for summary judgment. Ramirez now appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm in part, reverse in part, and remand for further proceedings.

## I.   Factual background

A few minutes before 8:00 p.m. on May 2, 2003, Ramirez sat parked in his red BMW convertible outside a Rite Aid pharmacy on Beach Boulevard in Buena Park, California. Montez was patrolling the area in his patrol car when he noticed Ramirez's car with its parking lights on. The parties dispute many of the facts relating to Montez's subsequent detention, search, and arrest of Ramirez.

### A.   The detention

While still in his patrol car, Montez observed that Ramirez's seat was reclined and that Ramirez had his eyes closed and appeared to be asleep at the wheel. Montez decided to investigate further because he was aware that several grab-and-run type thefts of alcohol had occurred at the location and that getaway vehicles are commonly used in thefts and robberies. Montez was also concerned that Ramirez may have had some medical problem, or may have been physically impaired.

Montez is certified by The International Association of Chiefs of Police as a Drug Recognition Expert. Montez attended an eighty-hour program administered by the California Highway Patrol which included training on the techniques of drug influence evaluation, recognition of the signs and

symptoms of persons under the influence of drugs, and the physiology and effects of drugs on the body. Montez also received extensive instruction and demonstrated proficiency on how to properly conduct vital sign and eye examinations, and the use of approved field sobriety tests. The training program instructed Montez that many drugs, including Central Nervous System (CNS) stimulants, may significantly increase respiration; that falling asleep quickly, inappropriately, and sometimes uncontrollably, is a common side effect of CNS stimulants; that irritability is a general indicator of CNS stimulant use; that pupil dilation beyond 6.5mm is indicative of drug use; that the normal adult pulse rate is 60 to 90 beats per minute and that an elevated pulse is indicative of drug use; and that distorted time perception is indicative of drug use.

Montez pulled behind Ramirez's vehicle, got out of his patrol car, and walked up to Ramirez's driver's-side door. According to Montez—as related in his March, 2004 deposition and in a declaration made in September of 2004 and attached to the defendants' motion for summary judgment— after reaching the driver's-side door, he observed Ramirez for three to five seconds. During this time, Montez claims Ramirez's eyes were closed and that he appeared to be breathing rapidly, as if he had been exercising. Montez estimated that Ramirez took "[a]bout 10, 12" breaths during this three-to-five-second period. Montez also illuminated Ramirez's chest/waist area with his flashlight, observed Ramirez's hands in his front by his waist area, and then knocked on the window. According to Montez, Ramirez opened his eyes, looked at him and either opened the window or the driver's door slightly. Montez claims that Ramirez appeared irritable and aggressive and assertively asked if it was necessary to knock on his window. Montez told Ramirez that he was checking on him and asked what he was doing. Ramirez responded that he was tired and was taking a nap. According to Montez, Ramirez's pupils appeared to be dilated beyond the normal range. Montez began to suspect that Ramirez might be under the influence. Still not satisfied as to what Ramirez was

doing, Montez asked him to get out of the car to further investigate. Ramirez complied. At this point, Montez observed that Ramirez's keys were in the ignition.

According to Ramirez, he had been sleeping about twenty to twenty-five minutes when Montez knocked on his window. Ramirez also claims he was not breathing rapidly when Montez first observed him. Although he was asleep at that time and therefore could not have been aware of his breathing pattern, Ramirez relies on Montez's police report dated May 3, 2003 to support this claim. Ramirez notes that Montez's police report describes the events of May 2, 2003 chronologically, and that in the report, Montez "noticed Ramirez had dilated pupils and appeared to be breathing fast," only after he "tapped the driver's seat window, and Ramirez opened his eyes and looked at [him]." After being startled by the knocking on his window, Ramirez slightly opened his door to talk to Montez. According to Ramirez, Montez's first questions were about drinking or doing drugs. Ramirez responded that he did not drink or do drugs. Although Ramirez's counsel conceded at oral argument that Ramirez's response "could be accurately characterized as testy," Ramirez claims that he was neither irritable nor aggressive when he "calmly but firmly asked [Montez] if this was a standard procedure to go around banging on glass windows of persons that are sitting or sleeping in their cars." Montez responded by clenching his teeth, staring at Ramirez "with an extreme hard look," and exclaiming, "Okay we were going to do this the easy way. I would have asked a couple questions and you would have been on your way. But now we will do it the hard way. Get out of your car!" Startled and very frightened, Ramirez complied. Furthermore, Ramirez contends that Montez could not have seen his pupils from where Montez was standing while Ramirez was still seated in his vehicle. Although Ramirez could not see into his own eyes, he offered photographic evidence, produced after the fact, to show the unlikelihood Montez was able to see his pupils during the initial encounter. Construing these facts in the light most favorable to Ramirez, we must

assume Montez was unable to sufficiently see Ramirez's pupils. This, however, does not mean we assume Ramirez's pupils were not dilated, but rather that his pupil dilation is not a factor to be considered in the reasonable suspicion and probable cause determination.

## B.   The pat-down search

According to Montez, he performed a pat-down search for officer safety once Ramirez stepped out of his car. Montez testified that he tapped Ramirez's outer garments to make sure there were no bulges or weapons concealed. Montez did not mention the pat-down search in either his police report or his declaration in support of the defendants' motion for summary judgment. Montez testified that he did not include the pat-down search in his police report because it was "something that [he] would recall, so [he] . . . didn't put it in there."

According to Ramirez, once he was out of his vehicle Montez ordered him to put both hands on top of the car. Montez proceeded to search Ramirez, which included reaching into his pockets. Ramirez did not consent to the search.

## C.   The arrest and impoundment

According to Montez, after performing the pat-down search he took Ramirez's pulse and found it to be 132 beats per minute. Montez also administered a field sobriety test called the "Romberg test." The Romberg test evaluates an individual's internal clock by asking the individual to estimate the passing of thirty seconds while standing with his eyes closed and his head tilted back. It is within the acceptable margin of error for an individual to take between twenty and forty seconds to estimate the passing of thirty seconds. According to Montez, Ramirez took forty-five seconds to estimate the passing of thirty seconds. As a precaution, Montez also requested that a follow-up officer respond because once out of his vehicle, Ramirez appeared to be irritable and confrontational. Accord-

ing to Montez, because Ramirez had exhibited several classic signs of being under the influence of a controlled substance, including apparent uncontrollable sleepiness, irritability, rapid breathing, dilated pupils, markedly elevated pulse and distorted time perception, along with the lack of any medical explanation for his symptoms, he arrested Ramirez for violation of California Health and Safety Code § 11550.[1]

According to Ramirez, after the pat-down search, Montez demanded to know what kind of drugs he was doing. Ramirez again told Montez that he did not use drugs or drink alcohol. After ordering Ramirez to hold out his left arm, Montez held Ramirez's left wrist for about fifteen seconds while he looked at his watch. According to Ramirez, he explained to Montez that many times he worked about seventy-five to eighty hours a week as the owner of an Outback Steakhouse in Buena Park, that he was simply resting in the parking lot because he was very tired, and that his home was located a little over a mile away. According to Ramirez, Montez then had him sit in the backseat of the patrol car while Montez used the car's computer console. Ramirez claims that Montez then ordered him out of the car and administered three field sobriety tests: the Romberg test, the finger to nose test (which required Ramirez to extend his arms parallel to the ground, to tilt his head back, and to touch his nose with alternating index fingers), and the pupil measurement test. According to Ramirez, he performed the finger to nose test perfectly. Montez then handcuffed Ramirez and placed him in the back of the patrol car.

In response to Montez's request for a follow-up officer, Buena Park police officers Frank Hornung and Marc Odom arrived at the scene. Upon their arrival, Montez asked Hornung and Odom to store Ramirez's vehicle for safekeep-

---

[1]Section 11550 prohibits persons from either using or being under the influence of certain enumerated controlled substances. Cal. Health & Safety Code § 11550.

ing, and they did so pursuant to California Vehicle Code § 22651(h)(1).[2]

Montez then transported Ramirez to the police station where he conducted further tests in an effort to determine what class of drug (or drugs) Ramirez may have taken. Montez testified that it was at the police station that he first measured Ramirez's pupils with a pupilometer. After administering the tests, Montez "opined" that Ramirez was under the influence of a CNS stimulant. Montez then ordered a blood test. Montez issued Ramirez a citation and released him on his own recognizance. The blood test later came back negative.

## II.   Standard of review

In the defendants' motion for summary judgment, they argued that Montez, Hornung, and Odom were qualifiedly immune from Ramirez's section 1983 claims, that Buena Park was entitled to judgment on Ramirez's unlawful seizure claim (for the impoundment), and that they were entitled to judgment on Ramirez's state law claims. The district court concluded that Montez was entitled to qualified immunity for his detention, search, and arrest of Ramirez, that the defendants were entitled to judgment on Ramirez's unlawful seizure

---

[2]Section 22651 provides in pertinent part:

A peace officer . . . or a regularly employed or salaried employee, who is engaged in directing traffic or enforcing parking laws and regulations, of a city, county, or jurisdiction of a state agency in which a vehicle is located, may remove a vehicle located within the territorial limits in which the officer or employee may act, under the following circumstances:

. . . .

(h)(1) When an officer arrests a person driving or in control of a vehicle for an alleged offense and the officer is, by this code or other law, required or permitted to take, and does take, the person into custody.

claim, and that there were no triable issues of material fact on Ramirez's state law claims.

We review a district court's grant of summary judgment *de novo*. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007). We also review a district court's decision as to whether an officer's actions are entitled to qualified immunity *de novo*. *Id.* We evaluate separately the applicability of the qualified immunity defense to each of Ramirez's constitutional claims. *See Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003) (officer entitled to qualified immunity for arrest though not for initial traffic stop).-

## III.   Qualified immunity

**[1]** "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). We evaluate a defendant's qualified immunity defense using a two-step inquiry. *Id.* However, the Supreme Court recently held that this two-step inquiry is no longer "an inflexible requirement." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) (explaining "that, while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory"). It is within our "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Under *Saucier*'s first prong, we consider whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. Where disputed issues of fact remain, we view the facts in the light most favorable to Ramirez, the non-moving party. *See Beier v. City of Lewiston*, 354 F.3d 1058, 1063 (9th Cir. 2004). "If no constitutional right would have been violated were the allegations

established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

Under *Saucier*'s second prong, we ask "whether the right was clearly established." *Id.* To be "clearly established," the " 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The dispositive inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* "If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id.* at 205.

## A. The detention

Ramirez first argues that his initial detention violated the Fourth Amendment because Montez did not have reasonable suspicion to order him to step out of his car. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Willis*, 431 F.3d 709, 714 (9th Cir. 2005). In such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion. *Arvizu*, 534 U.S. at 273. While reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence," an officer must be able to articulate facts creating grounds to suspect that criminal activity "may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006). We consider "the totality of the circumstances-the whole picture" when evaluating reasonable suspicion. *Sokolow*, 490 U.S. at 7.

In this case, because the parties do not dispute that a seizure occurred for Fourth Amendment purposes when Montez ordered Ramirez out of his car, we evaluate the detention's

constitutionality by considering the totality of the circumstances at that point. *See id.* at 7-8. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Taking the facts in the light most favorable to Ramirez, when Montez ordered Ramirez out of his car he knew the following: a few minutes before 8:00 p.m., Ramirez sat parked outside a drugstore with his parking lights on; Ramirez's seat was reclined; Ramirez had his eyes closed and appeared to be asleep at the wheel; Ramirez appeared to be breathing rapidly; and Ramirez gave a "testy" response when Montez tapped on his window. Although each fact, standing alone, is completely legal, "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States v. Bernard*, 623 F.2d 551, 560 (9th Cir. 1980) (quotation marks and citation omitted). To Montez, who had eighty hours of training in drug influence recognition, these facts taken together amounted to reasonable suspicion that Ramirez was under the influence of illegal stimulants.

**[2]** In fact, it is highly unusual to find someone asleep behind the wheel of a parked car, with its parking lights on, outside a drugstore at 8:00 p.m. The Fourth Amendment was not implicated when Montez approached Ramirez's driver's-side door, knocked on his window, and asked if he was willing to answer a few questions. *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007). The additional facts Montez learned shortly thereafter supported his suspicion that Ramirez may have been under the influence of a controlled substance. First, the fact that stimulant use can cause uncontrollable sleepiness remains undisputed. Uncontrollable sleepiness is consistent with sleeping at an unusual place and time without bothering to turn off the parking lights. Moreover, it is also undisputed that irritability and rapid breathing are characteristic of illegal stimulant use. Although Ramirez

claims he was not breathing fast, this mere assertion cannot create a disputed issue. He offers no evidence to the contrary, but instead attempts to point to a contradiction in Montez's declaration and police report. Montez, however, did not contradict himself; his declaration says Ramirez was breathing quickly while sleeping, and his police report confirms the quick breathing, without specifying when it began. Furthermore, nobody disputes that Ramirez's breathing was "abnormal[ly]" fast after he woke up. As a result, we must accept Montez's assertion that Ramirez was breathing quickly while asleep.

**[3]** Montez therefore could legally detain Ramirez by ordering him out of his vehicle to further investigate. Having concluded that Montez's detainment of Ramirez did not violate the Fourth Amendment, the district court properly granted Montez summary judgment on this claim. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

## B.  The pat-down search

**[4]** Ramirez next argues that the pat-down search violated the Fourth Amendment because Montez did not have reason to believe that he was armed and dangerous. Under the Fourth Amendment, a search for weapons is permissible "for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27; *see also Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979) ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked . . . ."). "Nothing in Terry can be understood to allow a generalized 'cursory search for weapons' or indeed, any search whatever for anything but weapons." *Ybarra*, 444 U.S. at 93-94.

A wide variety of factors support a reasonable belief that an individual is armed and dangerous. These include an officer's

observation of a visible bulge in an individual's clothing, *see United States v. Alvarez*, 899 F.2d 833, 839 (9th Cir. 1990); sudden movements or repeated attempts to reach for an object not immediately visible, *see United States v. Flippin*, 924 F.2d 163, 164-66 (9th Cir. 1991); and the nature of the suspected crime, *see United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000). However, facts merely establishing that *if* an individual were armed he would be dangerous are insufficient if there was no reason to believe that the individual actually *was* armed. *See United States v. Flatter*, 456 F.3d 1154, 1157 (9th Cir. 2006).

**[5]** Montez's only justification for the pat-down search of Ramirez is a conclusory reference to "officer safety." Montez has not alleged any specific facts that would establish reasonable suspicion that Ramirez was armed and dangerous. *See Terry*, 392 U.S. at 27. On the contrary, Ramirez was cooperative. He complied with Montez's request that he exit his vehicle, and there is no evidence he did so in a furtive manner. There is nothing in the record to suggest Ramirez made any abrupt movements or that he attempted to reach for anything upon exiting his vehicle. He also cooperatively submitted to the search of his person, albeit without his consent. Montez testified that he tapped Ramirez's outer garments "to make sure" there were no bulges or weapons concealed, but does not allege that he observed a visible bulge or weapon on Ramirez. Unless an officer can point to specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment tolerates no frisk. *Knowles v. Iowa*, 525 U.S. 113, 117-119 (1998).

**[6]** Being "testy" and suspected of illicit drug use does not support a finding that Ramirez had a weapon. Although the nature of the suspected crime itself does at times provide the requisite amount of reasonable suspicion to conduct a pat-down search of a detained individual, *see Mattarolo*, 209 F.3d at 1158, this court has never held that mere suspicion of drug use alone provides the basis for a *Terry* frisk. Indeed, to hold

that the pat-down here was consistent with the strictures of the Fourth Amendment would be to hold that a *Terry* frisk of a person is justified any time an officer believes an individual is under the influence, even though the officer lacks a reasonable suspicion that the person is armed and dangerous. Such a holding would be in direct conflict with *Terry* and its progeny, and would destroy the necessary distinction between the stop and frisk. "Each element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). Because Montez could not have reasonably suspected Ramirez had a weapon, we hold his pat-down of Ramirez violated the Fourth Amendment.

**[7]** Having determined the existence of a constitutional violation, we consider whether the right violated was clearly established at the time of its occurrence. *Saucier*, 533 U.S. at 201-202. At the time of Ramirez's pat-down, it was clearly established that every pat-down is unreasonable unless it is supported by the officer's reasonable suspicion that the person to be frisked is armed and dangerous. *Terry*, 392 U.S. at 27. Based on the complete lack of evidence that would support a reasonable suspicion Ramirez had a weapon, and Montez's wholly inadequate justification for the search, we conclude that it would have been clear to a reasonable officer that a pat-down of Ramirez was unlawful in this situation. As a result, Montez is not entitled to qualified immunity on the pat-down issue. Furthermore, there remains a factual dispute as to whether Montez impermissibly searched inside Ramirez's pockets. This disputed issue of fact also precludes the grant of summary judgment in Montez's favor.

## C. The arrest

**[8]** Ramirez next argues that his arrest violated the Fourth Amendment because it was not supported by probable cause. Montez arrested Ramirez pursuant to Cal. Health & Safety Code § 11550, which prohibits persons from either using or

being under the influence of certain enumerated controlled substances. The Fourth Amendment requires police officers to have probable cause before making a warrantless arrest. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981); *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Lopez*, 482 F.3d at 1072 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). While conclusive evidence of guilt is not necessary to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States*, 361 U.S. 98, 101 (1959)).

After Montez ordered Ramirez out of his car, he learned a few additional facts before placing him under arrest. First, knowing that the normal adult pulse rate is sixty to ninety beats per minute and that an elevated pulse rate is indicative of drug use, Montez found Ramirez's pulse to be 132. Second, Ramirez told Montez that many times he worked about seventy-five to eighty hours a week as the owner of an Outback Steakhouse in Buena Park, and that he was resting in the parking lot because he was very tired, despite having slept 6 hours the previous night, and despite being only a little over a mile from his home. Third, knowing that distorted time perception is indicative of drug use, Montez observed Ramirez take forty five seconds to estimate the passing of thirty seconds during the Romberg test. Fourth, Ramirez performed the finger to nose test perfectly.

Ramirez argues that his pattern of working long hours, which he conveyed to Montez, sufficiently explained why he was sleeping in his car. Furthermore, according to Ramirez, he was not irritable or aggressive, not antagonistic, and spoke calmly but firmly. Ramirez claims that his pulse was elevated because he was "startled" by Montez knocking on his window

and ordering him out of his car. Ramirez also contends that Montez could not have seen his pupils from where Montez was standing during the initial detention. And, Montez testified that the first time he measured Ramirez's pupils with a pupilometer was at the police station.

" 'As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.' " *Lopez*, 482 F.3d at 1073 (quoting *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988)). Therefore, Ramirez's perfect performance of the finger to nose test is relevant when considering the importance of his alleged distorted time perception. *See Caballero v. City of Concord*, 956 F.2d 204, 207 (9th Cir. 1992) (noting evidence did not clearly establish probable cause where parties disputed performance on sobriety tests). However, in considering the totality of the circumstances, Ramirez's innocent explanations for his odd behavior cannot eliminate the suspicious facts from the probable cause calculus. Rarely will a suspect fail to proffer an innocent explanation for his suspicious behavior. "The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior." *Thomas*, 863 F.2d at 627 (quoting *United States v. Sutton*, 794 F.2d 1415, 1427 (9th Cir. 1986)) (internal quotation marks omitted).

**[9]** Bypassing the constitutional question in the qualified immunity analysis, we exercise our discretion in reaching *Saucier*'s second prong first, *see Pearson*, 129 S. Ct. at 818, as it will "satisfactorily resolve" the arrest issue without having "unnecessarily to decide difficult constitutional questions." *See Brosseau v. Haugen*, 543 U.S. 194, 201-202 (2004) (Breyer, J., concurring) (urging the Court to reconsider *Saucier*'s mandatory, two-step protocol). Therefore, in determining whether the right here was clearly established, we ask "whether it would be clear to a reasonable officer [in Montez's shoes] that his conduct was unlawful in the situation he

confronted." *Saucier*, 533 U.S. at 202. The qualified immunity test gives "deference to the judgment of *reasonable* officers on the scene." *Id.* at 205 (emphasis added). We conclude that the objective facts known to Montez when he ordered Ramirez out of his car (apparent uncontrollable sleepiness, irritability, rapid breathing), together with the information Montez obtained after Ramirez was out of his car (elevated pulse rate and distorted time perception), could lead a reasonable officer confronted with the same situation to believe probable cause existed to arrest Ramirez.

[10] At the time of Ramirez's arrest, it was clearly established that every arrest "is unreasonable unless it is supported by probable cause." *Summers*, 452 U.S. at 700. While the "existence of probable cause necessarily turns upon the particular facts of the individual case, and prior decisions generally are of little help in deciding a specific case," *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008), we conclude that a reasonable officer in Montez's position would not have clearly known that his conduct was unlawful under these circumstances. *See Saucier*, 533 U.S. at 202. Although we do not decide whether the facts allege a constitutional violation, we do find that Montez's actions were reasonable in light of the qualified immunity analysis. Thus, Montez is entitled to summary judgment on this issue.

## D.   The impoundment

[11] Ramirez next argues that Montez, Hornung, and Odom's impoundment of his car was an unreasonable seizure under the Fourth Amendment. "The impoundment of an automobile is a seizure within the meaning of the Fourth Amendment." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). While Section 22651 authorizes an officer to remove a vehicle in the control of a person arrested, an impoundment pursuant to the authority of a "state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment." *Id.* at 864. " 'The ques-

tion in this [c]ourt upon review of a state-approved search or seizure is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment.' " *Id.* at 865 (quoting *Sibron v. New York*, 392 U.S. 40, 61 (1968)).

[12] " 'A seizure conducted without a warrant is per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." *Id.* at 862 (quoting *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)). Montez testified that Ramirez's car was taken for "safekeeping" after he was arrested, and when asked whether the "only reason that [he] wanted [Ramirez's car] removed was for safekeeping," Montez testified, "Correct." Therefore, the relevant exception is the "community caretaking" doctrine, which allows police officers to "impound vehicles that 'jeopardize public safety and the efficient movement of vehicular traffic.' " *Miranda*, 429 F.3d at 864 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368-69 (1976)).

[13] "Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." *Miranda*, 429 F.3d at 864. Here, Montez's concern that Buena Park might be held liable if Ramirez's car was stolen, vandalized, or some harm came to it was reasonable. There is nothing in the record indicating when Ramirez could return to the drugstore to retrieve his car. Leaving Ramirez's car in the drugstore parking lot would have made it an easy target for vandalism or theft. Therefore, we conclude that the officers' impoundment of Ramirez's car for its "safekeeping" was reasonable under the community caretaking doctrine. *See Hallstrom v. City of Garden City*, 991 F.2d 1473, 1477 n.4 (9th Cir. 1993) ("[I]t was not unreasonable for the arresting officers to protect the car from vandalism or theft by having it towed" from a parking lot.); *United States v. Jensen*, 425

F.3d 698, 706 (9th Cir. 2005) (officer's concerns about vandalism were reasonable).

**[14]** Having concluded that the officers' impoundment of Ramirez's car did not violate the Fourth Amendment, the district court properly granted the officers summary judgment on this claim. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

### E.   The blood test

The district court also granted summary judgment to the defendants on Ramirez's claim that the blood test performed at the police station following his arrest constituted an unreasonable search. Because Ramirez does not address this issue in his opening brief, we deem it waived. *See Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007) ("Generally, the federal courts deem waived any arguments that are not raised and presented in the parties' opening briefs."). Therefore, we affirm the district court's grant of summary judgment to the defendants on this claim.

### IV.   Municipal liability

**[15]** Ramirez next argues that Buena Park is also liable for the impoundment of his car because it had an unconstitutional policy and because it failed to train its officers. However, having concluded that the officers' impoundment of Ramirez's car was reasonable under the community caretaking doctrine, Buena Park may not be held liable under section 1983. *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006) (absent a constitutional deprivation city could not be held liable under section 1983); *see also Orin v. Barclay*, 272 F.3d 1207, 1217 (9th Cir. 2001) ("A § 1983 action against a city fails as a matter of law unless a city employee's conduct violates one of the plaintiff's federal rights."). There-

fore, the district court properly granted Buena Park summary judgment on this claim.

## V. State law claims

Ramirez's complaint also alleges state law claims for false arrest/imprisonment, trespass to personal property, intentional infliction of emotional distress, negligence, and battery. In their Motion for Summary Judgment, the defendants argued that they were entitled to summary judgment on each these claims. Ramirez did not address his state law claims in either his Motion for Partial Summary Judgment or in his Opposition to Defendants' Motion for Summary Judgment. Now on appeal, Ramirez argues that the district court erred when it granted the defendants summary judgment on all of his state law claims.

[16] " 'It is a general rule that a party cannot revisit theories that it raises but abandons at summary judgment." *Davis,* 478 F.3d at 1058 (quoting *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000)). " 'A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case.' " *Id.* (quoting *McMath*, 206 F.3d at 826). Here, because Ramirez abandoned his state law claims by not addressing them in either his Motion for Partial Summary Judgment or his Opposition to Defendants' Motion for Summary Judgment, he waived his challenge to the district court's order. Therefore, we affirm the district court's grant of summary judgment to the defendants on Ramirez's state law claims.

## VI. Evidentiary objection

Ramirez now also argues that the district court should not have admitted portions of certain declarations into evidence. While Ramirez objected to the declarations' admission, the district court never ruled on the objections, and Ramirez never

requested a ruling on the objections. Therefore, we do not consider Ramirez's evidentiary objection. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1066-67 (9th Cir. 1996) (evidentiary objection waived when district court does not rule on objection and no ruling requested by objecting party).

## VII. Conclusion

For the forgoing reasons, we reverse the district court's grant of summary judgment to Montez with respect to Ramirez's section 1983 claim for the unlawful pat-down search, and remand. We affirm the district court's grant of summary judgment to the Montez with respect to Ramirez's detention and arrest. We also affirm the district court's grant of summary judgment to the defendants with respect to the impoundment of Ramirez's car and the blood test.

We also affirm the district court's grant of summary judgment to the defendants on all of Ramirez's state law claims. Finally, we deem Ramirez's evidentiary objection waived.

**AFFIRMED in part, REVERSED in part, and REMANDED** for further proceedings consistent with this opinion.