**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LIA MARIE LINGO; V. R. S., a minor child (age 13), through Guardian Ad Litem, Lia Marie Lingo; J. P. L., a minor child (age 9), through Guardian Ad Litem, Lia Marie Lingo, *Plaintiffs-Appellants*, v. CITY OF SALEM, a municipality; STEVEN ELMORE, Salem Police Officer in his individual capacity and as a police official for Salem; JUSTIN CARNEY, Salem Police Corporal in his individual capacity and as a police official for Salem, *Defendants-Appellees.* | No. 14-35344 D.C. No. 6:12-cv-01019-MC ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted April 8, 2016
Eugene, Oregon

Filed June 27, 2016
Amended August 8, 2016

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain,
and Edward Leavy, Circuit Judges.

Order;
Opinion by Judge O'Scannlain

---

## SUMMARY[*]

---

### Civil Rights

The panel affirmed the district court's summary judgment in favor of police officers in an action brought under 42 U.S.C. § 1983 alleging that the officers falsely arrested plaintiff without probable cause after unlawfully entering the curtilage of her home to approach the back door.

The panel held that the exclusionary rule does not apply in § 1983 cases, and therefore police officers may rely on unlawfully obtained evidence to defend themselves against a constitutional tort action for false arrest. Accordingly, the panel rejected plaintiff's argument that the officers' unlawful entry into her home's curtilage necessarily tainted the arrest that followed. The panel held that the officers had probable cause to arrest plaintiff for endangering the welfare of a minor, in violation of Or. Rev. Stat. § 163.575, after smelling marijuana emanating from her house.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Marianne Dugan (argued), Eugene, Oregon; Brian Michaels, Eugene, Oregon; for Plaintiffs-Appellants.

Thomas V. Cupani (argued), Assistant City Attorney, City of Salem Legal Department, Salem, Oregon, for Defendants-Appellees.

**ORDER**

The opinion filed in this case on June 27, 2016, is hereby amended. An amended opinion is filed concurrently with this order.

With this amendment, the panel has voted unanimously to deny Appellants' petition for panel rehearing. Judge O'Scannlain has voted to deny Appellants' petition for rehearing en banc, and Judges Goodwin and Leavy have so recommended. The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and petition for rehearing en banc are **DENIED**. No subsequent petitions for rehearing or rehearing en banc may be filed.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether police officers may rely on unlawfully obtained evidence to defend themselves against a constitutional tort action for false arrest.

I

A

On the afternoon of June 13, 2010, Lia Lingo was engaged in an ongoing dispute with her neighbor, Suzanne Tegroen, regarding Tegroen's pet dog. In the course of the day, Lingo and Tegroen each contacted the Salem, Oregon, Police Department, and that night Officer Steven Elmore was dispatched to Tegroen's residence to investigate. Tegroen told Elmore that she felt verbally abused by Lingo and felt the need to tread lightly around her; Elmore responded that Lingo's conduct did not sound criminal, but that he would try to speak with Lingo to ease tensions.

Elmore walked to Lingo's house and noticed that its rear outside light was on. Rather than go to the home's front door, Elmore walked through Lingo's carport and knocked on the rear door located within. Stephanie Moore, a visitor, answered the door and went to retrieve Lingo to speak with Elmore. Elmore stated that as soon as Moore opened the door, he smelled marijuana.

Lingo came outside to speak with Elmore, and he asked her about the marijuana odor. Lingo explained that she was burning hemp-scented incense—which she admitted smells

like marijuana—but insisted that she had no actual marijuana inside. Skeptical, Elmore asked for permission to search Lingo's house; Lingo refused. Later, another officer, Justin Carney, arrived at Lingo's house to join Elmore. Carney stated that he also smelled marijuana coming from the house, and again the officers asked for permission to search the home. Lingo again refused.

At some point during the course of Elmore's discussion with Lingo, Lingo's seven-year-old child opened the back door and peered out. Elmore asked Lingo if there were children in her home, and she confirmed that she lived with her two minor children. Eventually, after Lingo's repeated refusals to allow the officers to search her home, they placed her under arrest for endangering the welfare of a minor, in violation of Or. Rev. Stat. § 163.575.

After Lingo was arrested, Elmore went into the home and collected the two children so that they could be moved somewhere safer. While Lingo sat in Elmore's police car, the children sat in the carport and eventually in the back of Carney's police car. At Lingo's direction, the children were brought to her great aunt's house under Oregon Department of Human Services supervision, where they remained for eight days.

Following Lingo's arrest, the police obtained a warrant to search Lingo's home for controlled substances, based upon an affidavit from Elmore describing the marijuana odor he smelled at her house. Pursuant to the warrant, Salem police searched Lingo's home and found several glass bongs, 1.8 grams of marijuana (including packaging), small baggies commonly used as drug packaging materials, and a small

amount of Klonopin, which is a schedule IV prescription drug.

## B

Lingo was charged by the Marion County District Attorney with two counts of child endangerment under Or. Rev. Stat. § 163.575. Before trial, Lingo moved to suppress evidence the police obtained in their search of her home, arguing that Officers Elmore and Carney violated the Fourth Amendment by entering her carport and approaching her home's back door. Lingo argued that any evidence collected by the police thereafter should be suppressed as the fruit of that initial unlawful search. The trial court agreed and granted Lingo's motion to suppress. The charges against Lingo were later dropped.

## C

Lingo then filed suit under 42 U.S.C. § 1983 against Elmore, Carney, and the City of Salem, alleging that the officers violated the First, Fourth, and Fourteenth Amendments of the federal Constitution by falsely arresting her without probable cause and by interfering with her (and her children's) right to familial association by causing her children to be removed from her home. She sought both compensatory and punitive damages.

The officers and the City moved for summary judgment, and Lingo moved for partial summary judgment. In her motion, Lingo argued that the officers violated her Fourth Amendment rights by entering the curtilage of her home to approach the back door. Lingo's motion did not specify how that violation related to her claims for false arrest or wrongful

separation from her children. Perhaps anticipating that, if she prevailed on her motion, Lingo would then attempt to prevent the officers from introducing evidence obtained in violation of the Fourth Amendment to defend themselves and to justify their decision to arrest her, the district court requested briefing on the issue of whether the exclusionary rule had any application in this § 1983 case.

After receiving the supplemental briefing, the district court agreed with Lingo that the officers had indeed violated the Fourth Amendment by entering her home's curtilage, but concluded that the exclusionary rule does not apply to § 1983 claims. The court thus held that the officer's initial Fourth Amendment violation did not taint their ultimate arrest of Lingo and found that, based on the marijuana they smelled at the house, the officers indeed had probable cause to arrest her. The court further held that the officers permissibly relocated Lingo's children to her aunt's home, where they would be away from the suspected marijuana use and where they would not be left home alone. Finally, the court concluded that Lingo had not adequately demonstrated municipal liability. The court granted summary judgment for all defendants.

Lingo timely appealed.

## D

On appeal, Lingo challenges only the district court's ruling that her arrest was valid.[1] Specifically, she contends

---

[1] Lingo does not challenge the district court's conclusion that, if the arrest was valid, so too was the officers' decision to relocate her children, nor does she challenge the court's determination that Lingo failed to

that the district court erred in concluding that the officers had probable cause to arrest her. She argues that such conclusion was flawed because: (1) the officers may not establish probable cause through evidence they gathered as a result of their illegal entry into her carport; and (2) in any event, the undisputed facts at the scene did not support a finding of probable cause.

We address each argument in turn.

## II

Lingo's primary argument on appeal is that the officers' unlawful entry into her home's curtilage necessarily tainted the arrest that followed. Drawing from the exclusionary rule's fruit-of-the-poisonous-tree doctrine, she argues that, because the officers were not constitutionally permitted to stand at her house's back door,[2] they did not have probable cause to arrest her on the basis of evidence they perceived from that unlawful vantage point.

## A

We first consider Lingo's contention that the exclusionary rule itself should apply in a § 1983 case.[3]

---

demonstrate municipal liability on behalf of the City.

[2] On appeal, the officers do not challenge the district court's conclusion that they violated the Fourth Amendment by entering the carport and approaching the back door of Lingo's home.

[3] Both the district court and the parties have focused on the issue of whether the exclusionary rule applies in § 1983 cases. That strikes us as a somewhat unusual question to ask here. As explained below, the

Of course, the government may not use evidence seized during an unlawful search as proof against the victim at criminal trial. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963). The "fruit of the poisonous tree" doctrine extends the exclusionary rule to require suppression of other evidence that is derived from—and is thus tainted by—the illegal search or seizure. *See id.* at 487–88. These rules are not constitutionally required, but instead are "judicially created means of deterring illegal searches and seizures." *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998). And "because the [exclusionary] rule is prudential rather than constitutionally mandated," courts apply it "only where its deterrence benefits outweigh its substantial social costs." *Id.* (internal quotation marks omitted). Suppression of evidence through the rule "has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

The exclusionary rule is not "a personal constitutional right of the party aggrieved." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Correspondingly, the rule "does not proscribe the introduction of illegally seized evidence in all proceedings or against all persons." *Penn. Bd. of Prob.*, 524 U.S. at 363 (internal quotation marks omitted). Indeed, the Supreme Court has "repeatedly declined to extend the exclusionary rule to proceedings other than criminal trials." *Id.* For example, the Court has held that the rule generally

---

exclusionary rule is only an *evidentiary* remedy, which prohibits the use of certain evidence at criminal trial. But we find no indication in the record that Lingo ever sought to exclude evidence in this case on the basis of such rule. Accordingly, even if we were to conclude that the exclusionary rule does apply to this action, it is unclear whether there is any evidentiary ruling that would be affected by that conclusion.

does not apply to grand jury proceedings, civil tax proceedings, civil deportation proceedings, or parole revocation proceedings. *See id.* at 363–64; *but see Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1015–16 (9th Cir. 2008) (holding that the exclusionary rule may still apply in deportation proceedings where the government committed an "egregious" constitutional violation).

Critical here, "standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence *to incriminate* the victim of the unlawful search." *Calandra*, 414 U.S. at 348 (emphasis added). This limitation makes sense: the need to deter unlawful conduct is strongest when that conduct could result in criminal sanction for the victim of the search. *Id.* Moreover, preventing the government from using evidence in such settings takes away an obvious incentive—the successful prosecution of crime—that may otherwise induce the government to ignore constitutional rights. *See generally Elkins v. United States*, 364 U.S. 206, 217 (1960) (purpose of exclusionary rule is to "remov[e] the incentive to disregard" the Fourth Amendment).

Conversely, in a § 1983 suit, the need for deterrence is minimal. Here, application of the exclusionary rule would not prevent the State from using illegally obtained evidence *against* someone, but instead would prevent state actors merely from *defending themselves* against a claim for monetary damages. Exclusion of evidence in this context would not remove any preexisting incentive that the government might have to seize evidence unlawfully. It would simply increase state actors' financial exposure in tort cases that happen to involve illegally seized evidence. In effect, § 1983 plaintiffs would receive a windfall allowing

them to prevail on tort claims that might otherwise have been defeated if critical evidence had not been suppressed. Even if such application of the rule might in some way deter violative conduct, that deterrence would impose an extreme cost to law enforcement officers that is not generally countenanced by the doctrine. *See Black v. Wigington*, 811 F.3d 1259, 1268 (11th Cir. 2016) ("The cost of applying the exclusionary rule in [the § 1983] context is significant . . . [a]nd the deterrence benefits are miniscule."); *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (observing that the availability of exclusionary rule in § 1983 cases "would vastly overdeter police officers and would result in a wealth transfer that is peculiar, if not perverse" (internal quotation marks omitted)); *see also United States v. Leon*, 468 U.S. 897, 907 (1984) ("The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern.").

For these reasons, federal courts of appeals have widely held that the exclusionary rule does not apply in § 1983 cases. *See, e.g.*, *Black*, 811 F.3d at 1268; *Townes*, 176 F.3d at 145–46; *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) (per curiam); *Machado v. Weare Police Dep't*, 494 F. App'x 102, 106 (1st Cir. 2012) (per curiam). We agree, and we join those courts now.[4]

---

[4] Lingo mostly ignores the many cases which have rejected her argument, and instead focuses on an inapposite doctrine: the distinction between "intrasovereign" and "intersovereign" applications of the exclusionary rule, highlighted by the Supreme Court in *United States v. Janis*, 428 U.S. 433 (1976).

In *Janis*, the Court held that the exclusionary rule did not require exclusion from a federal civil tax proceeding evidence that had been unlawfully obtained by state law enforcement agents. *Id.* at 459–60.

## B

Lingo's briefs might be read to suggest that the principles underlying the fruit-of-the-poisonous-tree doctrine mean that information which was obtained in violation of the Fourth Amendment may not be used as probable cause to arrest her. In other words, Lingo suggests that perhaps the Fourth Amendment prohibits not only unlawful searches but also any arrest that is justified solely on the basis of evidence procured

---

Recognizing that some courts had applied the exclusionary rule in certain civil enforcement actions, the Court distinguished those courts' approval of *intra*sovereign applications of the rule (in which the same sovereign that was responsible for the underlying Fourth Amendment violation later sought to use its own illegally obtained evidence) from *inter*sovereign applications (in which a sovereign sought to introduce evidence that had been illegally obtained by a completely separate sovereign). *Id.* at 455–58. Without commenting on the validity of intrasovereign application of the rule, the Court held that, at a minimum, the purposes of the exclusionary rule are not served by imposing the rule in a civil intersovereign case. *Id.*

Lingo argues that *Janis* suggests that the exclusionary rule *should* be applied in an intrasovereign § 1983 case. But this argument turns *Janis* on its head. The Court's discussion in *Janis* shows that the core application of the exclusionary rule is confined to the criminal context. *See id.* at 446–47. The Court addressed the intrasovereign / intersovereign distinction only to identify yet another constraint on the rule: even in those limited civil cases in which some courts might be inclined to apply the rule, they may not do so in the intersovereign context. *See id.* at 455–58. But the fact that the exclusionary *never* applies in intersovereign civil cases says nothing for when the rule ought to apply in intrasovereign cases.

Accordingly, regardless whether this is an intrasovereign or an intersovereign case, that fact would not alter our conclusion that the exclusionary rule does not apply in a § 1983 case.

from such an unlawful search.  We find no authority supporting such an argument.

As noted above, the exclusionary rule and its fruit-of-the-poisonous-tree doctrine are "judicially created remed[ies] designed to safeguard Fourth Amendment rights generally through [their] deterrent effect, rather than a personal constitutional right of the party aggrieved." *Calandra*, 414 U.S. at 348.  The wrong condemned by the Fourth Amendment is the invasion of an individual's privacy.  That wrong is already "fully accomplished by the unlawful search or seizure itself, and the exclusionary rule is neither intended nor able to cure" that wrong after it has occurred.  *Leon*, 468 U.S. at 906 (internal quotation marks and citation omitted); *accord Calandra*, 414 U.S. at 347.  Accordingly, "the *use* of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong." *Leon*, 468 U.S. at 906 (internal quotation marks and alteration omitted) (emphasis added).

For these reasons, nothing within the fruit-of-the-poisonous-tree doctrine suggests that an officer must ignore facts that would give him probable cause to arrest a person merely because those facts were procured through an unlawful search.  Indeed, as a general matter, probable cause determinations depend on the substance of the information known to the officer, not whether that information would be admissible in court.  *See Crowe v. County of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) (noting that evidence establishing probable cause need not be admissible).  And as the Second Circuit explained in rejecting an argument similar to Lingo's, "[t]he evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Townes*, 176 F.3d at 148.  The exclusionary rule

already provides a person in Lingo's position "an enormous benefit by reason of the illegal . . . search to which [she] was subjected: [her] freedom, achieved by the suppression of evidence" at criminal trial. *Id.* But the Supreme Court has made clear that this suppression remedy does not mean that the government's use of illegally obtained evidence is itself a constitutional concern. *See, e.g.*, *Penn. Bd. of Prob.*, 524 U.S. at 362 ("We have emphasized repeatedly that the government's use of evidence obtained in violation of the Fourth Amendment does not itself violate the Constitution.").

Once again, the federal courts of appeals that have considered this issue appear to be in accord: "The lack of probable cause to . . . search does not vitiate the probable cause to arrest" on the basis of evidence found in that search. *Townes*, 176 F.3d at 149; *see also Black*, 811 F.3d at 1268 ("[O]fficers can rely on [illegally obtained evidence] to prove that the arrest warrants were supported by probable cause."); *Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2001) ("Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy . . . but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution." (internal quotation marks omitted)); *Vigeant v. United States*, 245 F. App'x 23, 24–25 (1st Cir. 2007) (per curiam) (agents executing an invalid search warrant had probable cause to arrest homeowner after discovering firearms in the house). We again agree, and we join those courts in rejecting Lingo's suggestion that probable cause to arrest may be supported only by information that was obtained in accordance with the Fourth Amendment.

III

Finally, Lingo argues that even if the officers are permitted to justify their decision to arrest her through evidence they obtained unlawfully, there are genuine issues of fact regarding whether the circumstances in this case gave the officers probable cause to arrest her. "Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed an offense." *Crowe*, 608 F.3d at 432 (internal quotation marks and ellipsis omitted). The facts must be such that a prudent person would conclude that there was a "fair probability" the individual committed the crime. *Id.* (internal quotation marks omitted).

Lingo was arrested and charged with violation of Or. Rev. Stat. § 163.575, which, among other things, makes it a crime to "[p]ermit[] a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted." *Id.* § 163.575(1)(b). Marijuana is a Schedule II controlled substance in Oregon, Or. Admin. R. 855-080-0022 (2016) (Schedule of Controlled Substances), and at the time of arrest, it was unlawful for any person in Oregon "knowingly or intentionally to possess marijuana," Or. Rev. Stat. § 475.864, unless the person held a valid medical marijuana card, *see Emerald Steel Fabricators, Inc. v. Bureau of Labor & Indus.*, 230 P.3d 518, 519–20 (Or. 2010).

There is little question that the officers had probable cause to arrest Lingo for this offense. Both officers at the scene stated that they smelled a strong marijuana odor emanating from Lingo's house. Both officers were trained to

detect such odors, and Lingo herself admitted the presence of such an odor.  Prior to the arrest, Elmore ran a records check on Lingo and confirmed that she did not have a medical marijuana card and that the house was not a registered medical marijuana grow site.  In other words, the officers knew it was unlawful for Lingo knowingly to possess marijuana, and, in turn, that it was a crime for her to allow minors to remain in a place in which she did.  Once the officers saw one of Lingo's children—and once Lingo herself told the officers that she had two minor children in the house—the underlying facts needed to sustain a violation of section 163.575 were complete.  In short, the combination of the marijuana odor, the undisputed presence of Lingo's children in the house, and the fact that Lingo did not have medical marijuana privileges gave the officers probable cause to believe that Lingo had committed a crime.  *See, e.g.*, *United States v. Kerr*, 876 F.2d 1440, 1445 (9th Cir. 1989) ("[T]he presence of the odor of contraband may itself be sufficient to establish probable cause."); *United States v. Barron*, 472 F.2d 1215, 1217 (9th Cir. 1973) (per curiam) ("[T]he fact that an agent familiar with the odor of marijuana[] smelled such an odor emanating from the automobile . . . alone was sufficient to constitute probable cause . . . ."); *State v. Derrah*, 84 P.3d 1084, 1087 (Or. Ct. App. 2004) ("The scent of marijuana, emanating from a residence, without more, is sufficient to support a conclusion that marijuana will likely be found inside that residence.").

Lingo does not dispute the well-founded conclusion that—if the officers could smell marijuana—they had probable cause to arrest her.  Instead, she makes a passing attempt to cast doubt on the veracity of the officers' assertions that they actually smelled the drug, by noting how little marijuana was later found in her home.  But Lingo's

skepticism flies in the face of her own admission that she told the officers they smelled hemp incense, which she said does—and is intended to—smell like marijuana. In other words, it is undisputed that there was a *marijuana-like* odor, even if Lingo insists that the officers could not rule out the possibility that the odor came from something other than marijuana itself.

It is decidedly not the officers' burden to "rule out the possibility of innocent behavior" in order to establish probable cause. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) (internal quotation marks omitted). Indeed, "[r]arely will a suspect fail to proffer an innocent explanation for his suspicious behavior." *Id.* Thus, the mere fact that Lingo suggested a potential lawful source of the marijuana-like odor does nothing to contradict the officers' statements that such an odor existed. In short, Lingo gives no reason to doubt that the officers indeed smelled what they suspected to be marijuana; as explained above, such odor gave the officers probable cause to arrest Lingo under Oregon law.

IV

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.