Filed 11/18/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JONTE B. KING, | B257676 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC486961) |
| v. | |
| STATE OF CALIFORNIA et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Mary H. Strobel, Judge. Affirmed in part and reversed in part. Cross-appeal dismissed.

Mesisca, Riley & Kreitenberg, Dennis P. Riley and Rena E. Kreitenberg for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Chief Assistant Attorney General, Kristin G. Hogue, Senior Assistant Attorney General, Elizabeth S. Angres, Supervising Deputy Attorney General, and Edward P. Wolfe, Deputy Attorney General, for Defendants and Appellants.

_____

The State of California and California Highway Patrol (CHP) Officer Benjamin Tawney appeal from a judgment following a jury trial, in which the jury found Tawney violated (1) title 42 United States Code section 1983 (hereafter section 1983) by making a constitutionally unreasonable detention and search of plaintiff Jonte B. King and (2) Civil Code section 52.1, also known as the Tom Bane Civil Rights Act (Bane Act), by making threats of violence.

The state and Tawney contend the jury's findings are not supported by sufficient evidence, the trial court committed evidentiary error, they were entitled to qualified immunity, and the verdicts were inconsistent. We agree the evidence was insufficient to support the Bane Act finding and reverse as to that claim only, but otherwise affirm.

King filed a cross-appeal challenging the trial court's denial of a $25,000 civil penalty under the Bane Act. Given our reversal of the Bane Act claim, we dismiss the cross-appeal as moot.

## BACKGROUND

### Events preceding the traffic stop

On May 4, 2011,[1] CHP Officer Ryan Knauss was in his third phase of post-academy training and assigned to the CHP's South Los Angeles station. Tawney was his assigned instructor. Knauss, as trainee, was supposed "to make up" [sic] his own stops, with Tawney "overseeing" his performance. Knauss arrived early that day, as was his practice, to "get everything set up with the vehicle," including the "MVARS" audio and video recording system. He checked the operation of the MVARS system by turning on the overhead lights to make sure the MVARS system automatically turned on. He also turned it on manually, turned on the microphones, and synchronized them to the system.

On May 4 Knauss and Tawney were assigned to patrol "Beat 2," which was located in an unincorporated area of Los Angeles County east of the Harbor Freeway, between Compton, Carson, and South Central Los Angeles. Tawney testified he "volunteered for a special operations plan in Beat 2 that evening." "[M]anagement"

---

[1] Undesignated date references are to 2011.

2

wanted "additional enforcement" in Beat 2 to address community concerns arising from the operation of a premises Tawney variously termed a "clubhouse" and a "nightclub" by Rare Breed, a predominantly African-American group that Tawney variously called a motorcycle club and a motorcycle gang. The CHP assistant chief who directed his subordinates to conduct the special operations testified the group was not an "outlaw motorcycle gang but a group of motorcycle enthusiasts who celebrate and gather together in a celebratory manner on regular occasions that on occasion causes disruptions to the communities where they gather and celebrate." CHP officers were supposed to patrol in the vicinity of the nightclub and "aggressively enforce all Vehicle Code violations" to attempt to curtail problems such as public intoxication, excessive traffic, racing, and loud noise late at night.

The nightclub was located near the intersection of South San Pedro Street and 154th Street. Tawney testified he had patrolled the area around the nightclub on prior occasions, observed people gathering there on Wednesday nights, heard loud music coming from the club and motorcycles there, and made more than 10 stops just outside the club before May 4. In an audio recording played at trial, however, Tawney told Knauss before they left the station to go on patrol on May 4, "Apparently this club is located down here. It's near Avalon, San Pedro, 150th Street."

Knauss testified he had, at some point, received "multiple briefings" regarding "community concerns" about a "motorcycle club" called Rare Breed. On the night in question, however, he was "not aware of any particular issues" in Beat 2.

As Knauss was driving the streets of Beat 2 with Tawney as his passenger, he saw CHP Officer Duncan and his patrol car near the intersection of Redondo Beach Boulevard and South San Pedro Street. Duncan was impounding a white truck. Knauss pulled over and assisted him in inventorying the vehicle's contents. Apart from Knauss, Tawney, and Duncan, at least two other CHP officers and two sergeants were also present, along with at least four CHP patrol cars. The officers and their patrol cars were partially blocking the street and constricting traffic flow in each direction.

3

**King drove past, attracting the officers' attention**

King testified he was driving home from a Fresh and Easy market in his Infiniti SUV when he saw CHP officers on South San Pedro Street near Redondo Beach Boulevard. His daughters, aged four and six, were in the backseat watching a movie. His SUV had a "stock" sound system that included Bose speakers. A photograph of the sound system was introduced at trial by Tawney and the state.

Knauss testified that as he assisted Duncan, he heard loud music, turned, and saw it was coming from a vehicle about 80 or 90 feet north of him. The music lasted only two or three seconds before it stopped, according to Knauss. Tawney testified at trial he heard the music coming from an SUV that was about 100 feet north of where he was standing on the sidewalk watching the trainees. In his deposition testimony, however, he estimated he heard the music from 150 to 200 feet away.[2] Tawney was unable to "categorize the music" by genre. Tawney testified the music got louder and louder as the SUV approached the officers and was "at full volume" when the SUV passed them, though he could not estimate the decibel level.

Knauss testified that "[t]o the best of his knowledge" there was no sound coming from King's vehicle as it passed the officers. King testified the volume for the movie the girls were watching was set at "maybe 6 to 10 out of 20," and the volume stayed at that level until he turned the car off when he arrived home.

According to the officers, King's SUV passed within 12 feet of Knauss and about 30 feet from Tawney. Knauss estimated its speed at about 30 miles per hour, whereas Tawney estimated it at 25 to 30 miles per hour. King testified he had to "thread through" the officers and was going only five to nine miles per hour. The front windows were down and Knauss could see into King's vehicle. According to Knauss and King, King looked at the officers as he passed. King testified that he smiled at the officers. Knauss

_____

[2] All references to deposition testimony pertain to excerpts introduced at trial, all of which are part of the appellate record.

4

and Tawney testified they could not see King well enough at that time to determine his race.

The officers differed about which of them decided to stop King's SUV. Knauss testified he made the decision and informed Tawney and Duncan he wanted to stop the SUV for loud music. Tawney testified he initiated the pursuit by telling Knauss, "'Let's go. Get in the car.'"

A video taken by the MVARS system in the officers' patrol car was played at trial. It shows Knauss and Tawney walking toward their patrol car. It then depicts the view as Knauss drove the patrol car, making several turns, and ultimately coming onto the residential street where King was driving, far ahead of them. Knauss testified it took some time before the officers caught up to him, but they "knew where he was going" when he turned right on 157th Street from San Pedro, so "[t]here was no point in speeding after him."

**The detention and frisk**

Knauss testified that he did not activate his car's overhead lights until after King had turned onto Lorella Avenue, a residential street, and was about 10 feet from a driveway that King immediately turned into, after turning on his turn signal. Tawney testified they did not check the license plate of King's SUV because they were too far away to see it until they actually made the traffic stop. Review of the MVARS video reveals the neighborhood consisted of single-family homes, and the driveway King turned into was at a bend in the street, next to what appears to be an industrial or oil-producing property. Unfortunately, most of the ensuing interaction between King and the officers was outside the field of the MVARS video camera.

Tawney told Knauss he would approach King first, which meant Knauss was to go to the passenger side of the vehicle to act as "cover officer." Tawney testified at his deposition he took the lead "[d]ue to the abnormal nature of the traffic stop," i.e., "[i]t was being conducted in the driveway of a residence" that was "very near to the location of the Rare Breed nightclub." He was concerned that King or residents of the house

5

might be part of the motorcycle club. At trial Tawney testified he thought "[t]he more predominant possibility" was that King might be one of the concerned community members who had called the CHP to come and address the problems created by the nightclub.

King testified he looked in his side-view mirror and saw Tawney approaching with his gun drawn, but pointed toward the ground. King immediately placed his hands out the window and twice said, "'Please don't scare my kids.'" King testified at his deposition that he only got a glimpse of the gun, but it was black. Tawney testified his gun was silver and he had his hand on top of his gun as he approached the car. When asked by his own attorney, "Was your gun ever in the holster during the time you were at Mr. King's house?" Tawney responded, "No, it was not." Knauss testified, based upon his observations from the other side of the SUV, that Tawney did not have his gun drawn at any time during the incident.

Tawney testified that when he got up to the SUV he saw two kindergarten-age girls in the backseat. The vehicle's front windows were still down and Knauss was outside the open front passenger window. King's conversation with the officers was not recorded because the officers' MVARS microphones were not working. Tawney testified King started to open his car door, which was "somewhat expected" because King had pulled into his own driveway, and people commonly get out of their vehicle in that circumstance. It was nonetheless "a big red flag" for Tawney, who ordered King to stay in the car; King complied.

King testified Tawney asked him for his license and registration. King explained they were in his wallet and asked for permission to reach into his shorts' pocket to get his wallet. Upon receiving permission, King reached slowly to get his wallet, then asked for permission to open his wallet to remove the items.[3] Upon receiving permission, King handed Tawney his license and insurance card. King then asked, "in a nice tone," what

---

[3] In response to an interrogatory, King stated Tawney removed King's wallet and other items from King's pocket when King got out of the SUV.

was going on and why he had been stopped. He also said Tawney was scaring his kids. King testified Tawney did not say anything about a ticket for loud noise or music.

Knauss testified he heard King question Tawney about why they stopped him. He heard King repeatedly say his music was not loud and that he did not believe that was the reason he was stopped. Knauss characterized King as "argumentative," and testified King was "pretty much yelling at Tawney." Knauss also testified King began "rifling through the car," "opening up glove boxes, the center console," and "digging around and throwing things around trying to find" the documentation Tawney requested, i.e., license, registration, and proof of insurance. King denied there was any "rifling" or reaching under the seat, explaining that he kept his hands out the window at all times because he had seen Tawney's gun. Knauss testified that the two young children in the backseat of King's vehicle were crying and King said that the officers were scaring his children. Tawney testified King made this statement "in the latter half of the interaction."

King honked his SUV's horn. King testified he did so because Tawney had ordered him to get out of the car and he was frightened. He further testified that Tawney asked him why he had honked, and he explained, "'You're scaring me. I'm afraid. I need—I want my father to come out here and see. I need someone to come out here and see.'" Tawney testified he did not ask why King honked the horn, but King "may have related" that he honked because he was afraid of Tawney.

Tawney testified he told King to get out of the SUV only after King honked the horn, and did so because he "felt the need to eliminate the potential threats [he] was perceiving."

Tawney testified he concluded it was necessary and appropriate to frisk King based upon several factors. The first factor was King's demeanor. He was argumentative, i.e., "'[h]e argued the reason for the stop and maintained that argument throughout the conversation.'" He was "'largely hostile in nature. Very defensive,'" and "'his wording [was] very short and rapid.'" Second, King honked his SUV's horn, which was "very obviously a call for somebody to come out of the home. It was obvious to me

for that reason because my wife has done that to me when she pulls into the driveway. She'll honk the horn. It means come out. Help with the groceries, the kids, whatever it may be. [¶] . . . I didn't know what was going to come out in the house, whether it would come out in the same demeanor that Mr. King was acting at." Third, "there were street level criminal gangs that worked in and around the areas of Beat 2." In Tawney's deposition counsel repeatedly asked him to identify the gangs operating in that area, but Tawney could name only one such "gang": the Rare Breed motorcycle "gang." Fourth, King had "the present ability to conceal weapons" because he was wearing "loose fitting clothing" and "sitting inside a vehicle that had a number of places that I couldn't see." In his deposition Tawney admitted the concern about a vehicle containing a number of places in which a weapon could be concealed was "true in every stop."

Knauss testified on direct examination he "was never in fear for [his] life" during the interaction with King. On cross-examination he testified he feared for his "safety" during the interaction due to "the nature of all the arguments that were going on within the vehicle" and King's act of honking his horn. Knauss testified he was not aware of any "criminal gangs" operating in the area where they stopped King.

Tawney testified he had to order King to get out of the vehicle several times before King complied. King testified that when he got out of his SUV, Tawney ripped off King's hat and threw it onto the car seat. Tawney walked King down toward the rear of the SUV.

Tawney and Knauss testified that Tawney grabbed King's hands and used a "control hold" on them, "squeezing the fingers down on the opposite hand," then frisked him, which took about 20 seconds. King testified Tawney squeezed his hands and twisted his wrist back, causing him pain, of which he complained to Tawney. King testified Tawney responded by whispering, "'Do something.'" King felt Tawney was trying to provoke him to respond, but he was scared and "just didn't move." Tawney denied pulling or twisting King's wrists and denied that he made any threats to King.

8

Just before or during the frisk, King's father emerged from the house. Knauss testified he told King's father to go back inside and King's father complied. King and Tawney testified that Tawney told King's father to "get" or "take" "his ass back in the house" or he would be arrested or jailed.

Knauss testified that after Tawney frisked King, Tawney directed King to retrieve from his SUV an item of documentation the officers were missing. Knauss observed King "through the windows vaguely," but "wasn't paying attention to what [King] was physically grabbing." After King retrieved the documentation, he stood with Tawney near the foot of the driveway and spoke for several minutes while Knauss was writing the citation.

Tawney testified he was trying to explain again why King had been stopped and that there were community complaints about loud music, but King "wasn't buying it." King testified Tawney said he was not going to issue a ticket and explained there were "'some occurrences'" "'going on at a motorcycle club,'" then asked King what he knew about that and said, "'You look like you run with them.'" King testified he told Tawney he did not have a motorcycle or any knowledge of or association with the club. King then asked what Tawney would ticket him for. Tawney replied he would ticket King for loud music. King testified that was the first mention of loud music, and that he responded by asking Tawney how that was even possible and mentioned he had "'a stock system.'" Tawney then asked for King's registration, so King retrieved it from the SUV.

King testified that after he provided Tawney with his vehicle registration, he asked Tawney for medical assistance, and Tawney said King "was bullshit." King testified he told Tawney there was no reason to be disrespectful to him and asked whether Tawney was showing disrespect "'because [King was] Black'" and Tawney was racially profiling King. According to King, Tawney laughed and said, "'Oh, you want to throw your Black card out?'"

9

Tawney testified he had discussed "race as it correlates to the Rare Breed motorcycle club," i.e., he told King it was a predominantly African-American club. Tawney denied that race played any part in his decisionmaking in the incident with King.

**Citation and aftermath**

Knauss cited King for violating Vehicle Code section 27007. King asked both officers for their names and badge numbers. Knauss told King that his name and badge number were written on the citation. Tawney wrote his name and badge number on King's vehicle registration certificate even though, according to King, King asked him not to write on the registration slip. Tawney testified he did so because he did not want King to lose his badge number.

After the officers left, King phoned 911 to request medical attention for his wrists, which were hurting. Paramedics arrived, examined him, and gave him an ice pack.

The next day King filed a complaint with the CHP, alleging he had been racially profiled and the officers had been verbally abusive and used excessive force upon him by approaching with their guns drawn and twisting his hands and wrists. Thereafter, CHP Sergeant Kathy Moore interviewed King at his home and tested the volume of the sound system in King's SUV by having him turn it to the same level it was on when the officers stopped him, then attempting to record the sound from a distance of 50 feet. The results of that test were never provided to King and were not introduced at trial.

Knauss testified that about a week later he learned King had filed a complaint and that the officers' microphones had not been working during the stop and frisk. Tawney testified at his deposition that "[w]ithin a couple hours" after the incident, he and Knauss reviewed the MVARS recording of their interaction with King and discovered that the "audio from those microphones was not captured."

On June 13, King saw his physician and complained of wrist pain he had been experiencing since May 5 after having contact with police. After an examination and X-rays, King's physician determined the wrist was tender and diagnosed King as having a sprained wrist. He prescribed Meloxicam and recommended King use a wrist support.

10

At a later date, after the physician received the report on the X-rays, he recommended King consult an orthopedic surgeon. King instead took Motrin, wore medication-infused wrist bands, and used Biofreeze to "ice" his wrist. He still experienced occasional pain in the wrist at the time of the trial in this action. He also remained emotionally traumatized by the incident. An orthopedic surgeon called as an expert by Tawney and the state opined King suffered either no wrist injury or merely an insignificant one. The parties stipulated that the amount of King's medical expenses "due to his injuries he claims he sustained in this matter" was $138.03.

At the trial on the Vehicle Code citation King testified that "his stereo could not produce music that loud." Knauss also testified. King was found not guilty.

**Litigation and verdicts**

King sued the state and Tawney, alleging violations of section 1983, the Ralph Civil Rights Act of 1976 (Ralph Act) (Civ. Code, § 51.7), the Bane Act, assault and battery, and negligence. During trial, the state stipulated that it was vicariously liable for Tawney's conduct.

Using a special verdict form, the jury found Tawney violated section 1983 by conducting an unreasonable search and detention, causing harm to King, with Tawney's conduct as "a substantial factor in causing harm" to King. The jury found Tawney did not use excessive force. The jury further found Tawney violated the Bane Act by making a threat of violence, causing King "to reasonably believe that if he exercised his right to be free from an unlawful detention or search Officer Tawney would commit violence against him," that this violation harmed King, and Tawney's conduct was "a substantial factor in causing harm" to King. The jury further found, with respect to the Bane Act cause of action, that Tawney did not commit an act of violence. The jury also found Tawney did not violate the Ralph Act, did not assault or batter King, and was not negligent.

The jury found King's damages were as follows: $138.03 past economic loss, $10,000 past noneconomic loss, and $5,000 future noneconomic loss, for a total of

11

$15,138.03.  The jury found Tawney did not act with oppression, fraud, or malice.  The jury was not asked to, and thus did not, attribute the damages to any particular cause of action.

**Postverdict motions, entry of judgment, and appeals**

The state and Tawney moved for judgment notwithstanding the verdict (JNOV) on most of the grounds raised in this appeal, including insufficiency of evidence and qualified immunity, and for a new trial.  The trial court denied both motions.

The trial court also denied King's request to impose $25,000 in statutory penalties pursuant to the Bane Act.

The judgment was entered after it was amended by interlineation on November 5, 2014, to add $10,146.40 in costs and $350,000 in attorney fees.

The state and Tawney appealed.  King filed a cross-appeal challenging the trial court's denial of a statutory penalty on his Bane Act claim.

## DISCUSSION

**1.	Sufficiency of the evidence to support the jury's finding the traffic stop was constitutionally unreasonable**

The state and Tawney contend the evidence was insufficient to support the jury's finding that Tawney unreasonably detained King.

**a.	Applicable legal principles**

In reviewing the sufficiency of evidence to support the jury's finding, we review the record in the light most favorable to the prevailing party, resolving in favor of the prevailing party all conflicts in either the evidence or the reasonable inferences to be drawn therefrom, to determine whether the record contains substantial evidence, contradicted or uncontradicted, supporting the finding.  (*State Farm Fire & Casualty Co. v. Jioras* (1994) 24 Cal.App.4th 1619, 1625–1626; *Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 544, overruled on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580.)  "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value."  (*Roddenberry v.*

12

*Roddenberry* (1996) 44 Cal.App.4th 634, 651.)  "The focus is on the quality, rather than the quantity, of the evidence."  (*Ibid.*)  "Inferences may constitute substantial evidence, but they must be the product of logic and reason.  Speculation or conjecture alone is not substantial evidence."  (*Ibid.*)  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  (*Id.* at p. 652.)  The testimony of a single witness may be sufficient.  (*Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1075.)

A police officer may legally stop a car to conduct a brief investigation if the facts and circumstances known to the officer support a reasonable suspicion that the driver may have violated the Vehicle Code or some other law.  (*People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 200 (*Simon*).)  "The reasonable suspicion necessary to justify a detention is measured *solely* by an objective standard."  (*People v. Lloyd* (1992) 4 Cal.App.4th 724, 733.)  "Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' . . . and not on the officer's actual state of mind at the time the challenged action was taken."  (*Maryland v. Macon* (1985) 472 U.S. 463, 470–471 [105 S.Ct. 2778].)

### b.    Substantial evidence supports the unreasonable detention finding

In light of the tremendously contradictory testimony of Knauss and Tawney regarding the sound emanating from King's SUV, King's testimony and reasonable inferences therefrom were sufficient to allow the jury to conclude that the officers did not have a reasonable suspicion he had violated Vehicle Code section 27007.  Although King did not testify and probably lacked sufficient personal knowledge to testify that the sound coming from his car was not audible 50 feet away, the jury could reasonably infer that his "maybe 6 to 10 out of 20" testimony regarding the volume setting meant that the volume of the sound system was at or below its midpoint when he drove near and past the officers.  In addition, the jury could reasonably construe King's strenuous protests to the officers either before the frisk (according to the officers) or afterward (according to King)

13

that his car was not emitting loud sound as out-of-court statements by King to the effect that he was not violating the Vehicle Code. The jury was instructed it could consider a party's out-of-court statements as evidence, albeit with caution.

In contrast, Tawney and Knauss provided extremely inconsistent testimony regarding their basis for concluding the volume level of King's sound system violated the Vehicle Code as well as many other facts. Their inconsistencies did not pertain to mere inconsequential details, but went directly to the heart of the claimed statutory violation. In his deposition testimony, Tawney claimed he not only heard the music, but heard it as "loud" music 150 to 200 feet away—roughly double the distance of Knauss's testimony. The officers also differed in another crucial detail: whether the loud music lasted for just a few seconds and was completely absent at the time the SUV passed the officers or whether it instead got louder and louder as the SUV approached, so that it was at full volume when the SUV passed the officers. These immense inconsistencies between the officers' testimony and between Tawney's deposition and trial testimony clearly undermined their credibility. In addition, the jury, which clearly found King a largely credible witness, could infer that a midpoint or below volume setting on the sound system in King's SUV would not be sufficiently loud to register as "loud music" at a distance of 80, 90, 100, or 150 to 200 feet away, further undermining the officers' credibility. In addition, although Tawney and the state were not required to call any particular witness, King urged in argument that their failure to call any of the other four or more CHP officers, including two sergeants, at the scene of the impound further detracted from the credibility of Tawney and Knauss. King also urged the failure to provide evidence of the result of Sergeant Moore's "test" of King's stereo implied the result of the test favored King, not the officers. The jury could have concluded these omissions further detracted from the credibility of Tawney and Knauss.

Tawney and the state assert, without citation to authority, that King was required to prove "that no objective facts existed that would support a reasonable suspicion that King was in violation of the Vehicle Code." Essentially, they argue King was required to

14

not only prove his cause of action, but also disprove their defense thereto.  We reject this proposition.  The jury was properly instructed on King's burden of proof and the particular elements of the section 1983 claim.  (CACI No. 3000.)  If Tawney and the state believed that instruction was incorrect, they should have sought modification.  We note they do not challenge the accuracy of the instruction on appeal.

Viewing the record in the light most favorable to King, resolving all conflicts in his favor, we conclude the record contains substantial evidence supporting the jury's finding that Tawney unreasonably detained King.

## 2.     Admission of evidence King was acquitted of violating Vehicle Code section 27007

Before trial, the state and Tawney sought to exclude evidence of the outcome of King's trial on the charge of violating Vehicle Code section 27007 on the ground the evidence was irrelevant and there was a substantial danger it would confuse the issues or mislead the jury.  The trial court concluded the acquittal was relevant and admissible to King's claim the alleged Vehicle Code violation was a pretext for an unlawful detention.  It therefore denied exclusion.

The state and Tawney contend the trial court abused its discretion by admitting evidence that King was acquitted of the Vehicle Code violation.

### a.     Applicable legal principles

Only relevant evidence is admissible.  (Evid. Code, § 350.)  "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (*Id.*, § 210.)

We review a trial court's ruling admitting or excluding evidence for abuse of discretion.  (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885 (*Austin B.*).)

A judgment may not be reversed on appeal due to error unless, "after an examination of the entire cause, including the evidence," it appears the error caused a

15

"miscarriage of justice," i.e., prejudice. (Cal. Const., art. VI, § 13.) "To establish prejudice, a party must show 'a reasonable probability that in the absence of the error, a result more favorable to [it] would have been reached.'" (*Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1161.)

> **b.** **The trial court arguably erred by admitting evidence of the acquittal, but Tawney and the state have not established prejudice**

The standard of proof applicable in the trial of King's Vehicle Code infraction was beyond a reasonable doubt. Thus, his acquittal meant that the prosecutor did not establish, beyond a reasonable doubt, that he had violated Vehicle Code section 27007. In contrast, Tawney required only reasonable suspicion King had violated Vehicle Code section 27007 to constitutionally detain King via a traffic stop. The prosecutor's failure to meet the reasonable doubt standard at the trial had little or no tendency to prove the absence of reasonable suspicion preceding the stop. Nor was it relevant to either the officers' or King's credibility.

Evidence that King had to appear in court and stand trial on the citation was, however, relevant to his damages claim. He argued to the jury that the "inconvenience" of appearing in court several times on the citation was an aspect of his noneconomic damages. Admitting evidence that King had to make these court appearances without admitting the result of the proceedings would have left the jury wondering about the outcome of the proceedings. Excluding evidence of the outcome posed a risk of prejudicing King, if the jury speculated he had been found guilty. On the other hand, admission of the result without a limiting instruction potentially permitted the jury to consider the verdict as bolstering King's case herein. Ideally, the trial court would have admitted the evidence only with respect to King's damages and it would have instructed the jury to consider the evidence only for that purpose.

Tawney and the state argue admission of the acquittal was prejudicial because "there was no substantial evidence that Officer Tawney lacked probable cause to initiate a stop on King," and therefore the acquittal "held significant weight." Of course,

16

probable cause was not required to initiate the traffic stop. In any event, King never argued that his acquittal in any way demonstrated the unreasonableness of the traffic stop. He argued only that the inconvenience caused by his court appearances was an element of his damages. Tawney and the state argued to the jury that the acquittal was irrelevant to the validity of the traffic stop because "the burden of proof for a Vehicle Code Section 27007 violation is proof beyond a reasonable doubt. [¶] You do not have such a high standard here. You are free to make your own determination here on the evidence based on all that you have seen and heard, which is quite extensive, about that traffic citation. [¶] Now, it's also important to remember that when Officer Tawney and Officer Knauss pulled Mr. King over for a Vehicle Code Section 27007 violation, they did not have to know beyond a reasonable doubt that Mr. King had violated that Vehicle Code section. They only had to have a reasonable suspicion that Mr. King had violated that Vehicle Code. And a traffic stop does not become unlawful just because a citation is later dismissed."

These arguments were backed by the jury instructions, which informed the jury that in the trial of the Vehicle Code violation the prosecution had the burden of proving the defendant guilty beyond a reasonable doubt (which the court defined for the jury), while in the present case "a party who is required to prove something need only prove that it is more likely to be true than not true." It also instructed the jury that "[t]o be a reasonable detention, the officer must have a reasonable suspicion that the person being detained violated the Vehicle Code" and "the detention may last only so long as is reasonably necessary to perform the duties required by virtue of the stop."

Given all of these circumstances and the jury's obvious determination that King was generally a more credible witness than the officers, we cannot conclude that Tawney and the state have shown a reasonable probability that they would have obtained a more favorable result had evidence of the acquittal been excluded.

**3.    The State and Tawney's claim the frisk was constitutionally reasonable as a matter of law**

Tawney and the state contend that, "as a matter of law," the frisk was constitutionally reasonable because, in the totality of the circumstances, King's act of honking the horn created reasonable suspicion he was armed and dangerous. While they focus principally on the horn, they also cite King's "loud and argumentative" demeanor, the "dangerous neighborhood," and King's "loose clothing" as factors contributing to Tawney's reasonable suspicion.

**a.    Applicable legal principles**

In *Terry v. Ohio* (1968) 392 U.S. 1 [88 S.Ct. 1868] (*Terry*), the United States Supreme Court held that there exists "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (*Id.* at p. 27.) "[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." (*Ibid.*) "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Id.* at p. 21.) "And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" (*Id.* at pp. 21–22.) An officer's good faith is not enough. (*Id.* at p. 22.)

18

"[F]acts merely establishing that *if* an individual were armed he would be dangerous are insufficient if there was no reason to believe that the individual actually *was* armed." (*Ramirez v. City of Buena Park* (9th Cir. 2009) 560 F.3d 1012, 1022 (*Ramirez*).)

Where a traffic stop or other detention was constitutionally unreasonable, any ensuing frisk is also constitutionally unreasonable. (*People v. Souza* (1994) 9 Cal.4th 224, 229 (*Souza*); *Arizona v. Johnson* (2009) 555 U.S. 323, 326–327 [129 S.Ct. 781] (*Johnson*).)

### b. Substantial evidence supports the unreasonable search finding

Although Tawney and the state contend the frisk was reasonable "as a matter of law," they cite no authority for the proposition that the factors they cite necessarily constitute reasonable suspicion that King was armed or dangerous. It appears they actually intend to challenge the sufficiency of the evidence to support the jury's finding that the search (frisk) of King was constitutionally unreasonable. Indeed, they acknowledge they raised such a sufficiency challenge in their JNOV motion, then assert the trial court erred by denying it. Accordingly, we treat their contention as a sufficiency of evidence challenge.

Substantial evidence supported the jury's finding that the frisk was constitutionally unreasonable. First, because the jury found that the traffic stop was constitutionally unreasonable, Tawney was not permitted to frisk King. This fact is sufficient on its own to support the jury's finding that the frisk was unreasonable. We nevertheless address the remaining factors upon which Tawney and the state rely.

Tawney's express concern with the horn-honking was that it was intended to, and would in fact, draw others to the scene. King admitted he intended the honk to cause his father to come out of the house. The potential danger to the officers from other people coming to the scene, however, would stem from the presence and potential conduct of those other people. Frisking King would neither prevent others from coming to the scene nor avert any dangerous behavior by such persons. Indeed, frisking King increased the

19

potential risk the officers faced from the arrival of other people by drawing Tawney's attention away from the potential arrival of others while he focused on getting King out of the car and frisking him. In addition, the assertion that other people would arrive and pose a danger deflects the focus from specific and articulable facts supporting a reasonable suspicion *King* was armed or dangerous to speculative inferences about other persons who might come and might be armed or might outnumber the officers. If honking created any reasonable inference regarding whether King was armed or dangerous it was that he was *unarmed* and so vulnerable that he believed he needed the assistance of others to protect him, if only by acting as witnesses.

The state and Tawney's reliance upon King's demeanor ignores the contradictory testimony by King that he was polite, not argumentative, and that he put his hands out the window as he saw Tawney walking toward his car door so that the officers could see he was unarmed. The jury's verdict reveals it found King to be a credible witness, and the jury could have credited King's testimony about his demeanor. In contrast, the jury clearly did not find the officers' testimony to be completely credible. In addition to the numerous significant inconsistencies and several implausibilities in their testimony previously set forth in this opinion, it is noteworthy with respect to the frisk that the jury learned that in his responses to interrogatories, Tawney claimed King committed an assault and battery on *him*.

The jury reasonably could have discounted or rejected the purported factor of King's "loose clothing" after viewing the MVARS video, which shows King and his clothing from differing angles and for a significant period of time. His clothing was not oversized. He wore a T-shirt that, while not tight-fitting, appeared to be the appropriate size for him, with little empty space to spare. He also wore cargo shorts that appeared to be the appropriate size. His attire was in no way suggestive of gang membership and would not have appeared to be unusual in any common setting, e.g., shopping at a store or attending a sporting event. His T-shirt, for example, was no looser than one worn by a

20

man who was shown walking among the patrol cars in the CHP station parking lot in one of the other MVARS videos played at trial.

The jury also could have discounted King's presence in the car as a factor indicating he was armed and dangerous for several reasons. King testified he held his hands out the car window as Tawney approached, showing the officers he was not armed. He testified that before Tawney ordered him to get out of the car or frisked him, he had already reached into his shorts pocket to get his wallet, after asking and receiving permission. If Tawney actually and reasonably believed King's presence in the car or "loose clothing" suggested he was armed or dangerous, he would not have been likely to allow King to reach into his shorts or anywhere in the SUV. Similarly, both Knauss and Tawney testified that after frisking King, Tawney directed King to retrieve a missing item of the requested documentation (license, registration, proof of insurance) from the SUV, which had not been searched for weapons. This tends to diminish the credibility of the claim Tawney was concerned that there were weapons in the car. The jury also could have viewed the "in the car" factor to have been neutralized as soon as King got out of the car.

Perhaps most important, if mere presence in a vehicle were a ground for a reasonable suspicion that a person was armed, every traffic stop would automatically support a frisk of every person in the stopped vehicle. As the California Supreme Court has noted: "'Millions of such vehicles [involved in routine traffic violations] are stopped every year, and all but a small proportion are doubtless proceeding at the time on lawful business or innocent pleasure.' [Citation.] . . . 'Just as the arresting officer in an ordinary traffic violation case cannot reasonably expect to find contraband in the offender's vehicle, so also he cannot expect to find weapons. To allow the police to routinely search for weapons in all such instances would likewise constitute an "intolerable and unreasonable" intrusion into the privacy of the vast majority of peaceable citizens who travel by automobile.'" (*Simon*, *supra*, 7 Cal.3d at pp. 205–206.)

21

The jury also reasonably could have discounted or rejected the purported factor of gangs in the area. Absent some reason for believing King was in a gang, this factor does not reasonably suggest that King was armed or dangerous. Gangs are present throughout the vast majority of Los Angeles, Orange, Riverside, and San Bernardino Counties, as well as much of the rest of California and other cities and states. The California Supreme Court has cautioned that the crime-ridden nature of a location "is not an 'activity' of an individual. Many citizens of this state are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas. As a result, this court has appraised this factor with caution and has been reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual." (*People v. Bower* (1979) 24 Cal.3d 638, 645.) This rationale applies with equal force to frisking or searching a motorist stopped in a purported gang area, absent reason to suspect that the motorist is a gang member.

Moreover, Tawney's inability to name a single gang operating in the area provided the jury with a reasonable basis to doubt the credibility of his claim that this was a factor that caused him reasonably to suspect King might be armed or dangerous. Tawney had been assigned to, and working from, the South Los Angeles CHP station, patrolling in "the community," not just area freeways, for one and one-half years at the time of the incident with King and four years at the time of trial. The jury could reasonably expect that a law enforcement officer patrolling in a particular community would at least know the names of the gangs in the area if he were inclined, as Tawney was, to consider the proximity of gangs in his decision-making processes. In addition, the jury heard that in his deposition Tawney asserted other factors leading him to suspect King was armed or dangerous, but not the existence of gangs in the area. Then, after the participants took a break, he added this factor as part of his reasoning for the frisk, but could not name any of the gangs.

22

The jury also reasonably could have considered at least two other important circumstances as relevant to whether the facts available to Tawney when he decided to frisk King would have "'warrant[ed] a man of reasonable caution in the belief' that the action taken was appropriate." First, King was driving an expensive SUV with his two small daughters in the backseat. Second, the sole ground for the traffic stop was playing loud music, which has no tendency to suggest the driver is armed, dangerous, or involved in the activity of an unidentified local gang. (*People v. Miranda* (1993) 17 Cal.App.4th 917, 927 ["minor traffic offenses do not reasonably suggest the presence of weapons"]; *Simon*, *supra*, 7 Cal.3d at p. 206 ["the ordinary motorist who transgresses against a traffic regulation 'does not thereby indicate a propensity for violence or iniquity,' and the officer who stops him generally 'has not even the slightest cause for thinking that he is in danger of being assaulted'"]; *Ramirez*, *supra*, 560 F.3d at p. 1022 [nature of the suspected crime may support reasonable suspicion suspect is armed or dangerous].)

In sum, whether the frisk was constitutionally reasonable was a hotly contested issue at trial. It depended, in part, upon the resolution of disputed factual issues and credibility determinations. The jury was properly instructed regarding how to determine whether the frisk was constitutionally reasonable, and the evidence, viewed in the light most favorable to the judgment, supports the jury's finding.

**4.      Qualified immunity with respect to the frisk**

Tawney and the state contend that even if the frisk was not constitutionally reasonable, qualified immunity applies to preclude liability "because there is no governing law analyzing whether an individual's efforts to summon unknown third parties to the scene of a traffic stop . . . provides sufficient basis for reasonable suspicion that the individual is armed and dangerous." They raised this issue in their JNOV motion. The trial court rejected the theory on the ground the standards for reasonable suspicion were well established and should have been known to Tawney, and honking a horn was not so peculiar or dangerous to "upset this well-established standard." The state and Tawney contend the trial court erred.

23

### a. Applicable legal principles

"'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.'" (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110.) "If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied." (*Ibid.*) In ruling on a JNOV motion, "The trial judge cannot weigh the evidence [citation], or judge the credibility of witnesses." (*Ibid.*) "A judgment notwithstanding the verdict can be sustained only when it can be said as a matter of law that no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that the reviewing court would be compelled to reverse it, or the trial court would be compelled to set it aside as a matter of law." (*Moore v. City & County of San Francisco* (1970) 5 Cal.App.3d 728, 733.)

"On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.] If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

The doctrine of qualified immunity provides "government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." (*Anderson v. Creighton* (1987) 483 U.S. 635, 638 [107 S.Ct. 3034] (*Anderson*).) "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action [citation], assessed in

24

light of the legal rules that were 'clearly established' at the time it was taken." (*Id.* at p. 639.) An officer is entitled to qualified immunity if, taken in the light most favorable to the party asserting the injury, the facts alleged do not show the officer's conduct violated a constitutional right, or if the right violated was not clearly established at the time of the violation. (*Saucier v. Katz* (2001) 533 U.S. 194, 201 [121 S.Ct. 2151] (*Saucier*).)

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Saucier*, *supra*, 533 U.S. at p. 202.) "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful [citation]; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." (*Anderson*, *supra*, 483 U.S. at p. 640.)

"[Q]ualified immunity is a question of law, not a question of fact. [Citation.] But Defendants are only entitled to qualified immunity as a matter of law if, taking the facts in the light most favorable to [the Plaintiff], they violated no clearly established constitutional right. The court must deny the motion for judgment as a matter of law if reasonable jurors could believe that Defendants violated [the Plaintiff's] constitutional right, and the right at issue was clearly established." (*Torres v. City of Los Angeles* (9th Cir. 2008) 548 F.3d 1197, 1210.) "The availability of qualified immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment." (*Acevedo-Garcia v. Monroig* (1st Cir. 2003) 351 F.3d 547, 563.) "'[D]eference to the jury's view of the facts persists throughout each prong of the qualified immunity inquiry.'" (*A.D. v. California Highway Patrol* (9th Cir. 2013) 712 F.3d 446, 456.) "[T]he jury's view of the facts must govern our analysis once litigation has ended with a jury's verdict." (*Id.* at p. 457.) "Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the

judge, must determine liability." (*Sova v. City of Mt. Pleasant* (6th Cir. 1998) 142 F.3d 898, 903.)

**b.** **The state and Tawney were not entitled JNOV on the basis of qualified immunity**

Because the state and Tawney raised the qualified immunity issue by means of a JNOV motion, a finding that they were shielded by qualified immunity would require this court to conclude that, after viewing the evidence in the light most favorable to King, giving King the benefit of every favorable inference that may reasonably be drawn from the evidence, and resolving all conflicting evidence and inferences against Tawney and the state, as a matter of law the only reasonable conclusion legally deducible from the evidence is that Tawney's conduct did not violate a constitutional right that was clearly established on May 4, 2011.

The state and Tawney asserted qualified immunity only with respect to the frisk, not the traffic stop. Given our conclusion that substantial evidence supported the jury's finding that the traffic stop was unreasonable and the absence of any qualified immunity claim with respect to the stop, we must give deference to the jury's finding that the stop was constitutionally unreasonable. It was clearly established long before May 4, 2011, that a constitutionally valid traffic stop or other detention is a prerequisite to the constitutionality of an ensuing frisk. (See, e.g., *Souza*, *supra*, 9 Cal.4th at p. 229; *Johnson*, *supra*, 555 U.S. at pp. 326–327.) It would be clear to a reasonable officer who had made a constitutionally invalid traffic stop that frisking the driver he had improperly stopped would be unlawful. Accordingly, Tawney and the state are not entitled to qualified immunity for the frisk in this case.

Even if we were to disregard the constitutional invalidity of the traffic stop, we would conclude the trial court properly denied the JNOV motion with respect to qualified immunity. A key factor in ascertaining the applicability of qualified immunity in any case is determining "the level of generality at which the relevant 'legal rule' is to be identified." (*Anderson*, *supra*, 483 U.S. at p. 639.) The state and Tawney premise their

26

qualified immunity claim on an extremely narrow, factually detailed view of what the clearly established law would be in this case. They argue, "The issue is whether the law is 'clearly defined' governing whether such an attempt to summon others to the scene of a detention [by honking the car's horn], in combination with the undisputed factors of the neighborhood's reputation and King's loose clothing, constitutes a sufficient basis for reasonable suspicion that the detained person is armed and dangerous." Such "granular specificity" is not required, however. (*Torres v. City of Madera* (9th Cir. 2011) 648 F.3d 1119, 1129.) The United States Supreme Court has made it clear that "the very action in question" need not have "previously been held unlawful" if "in the light of pre-existing law the unlawfulness must be apparent." (*Anderson*, *supra*, 483 U.S. at p. 640.) "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." (*Hope v. Pelzer* (2002) 536 U.S. 730, 741 [122 S.Ct. 2508].) "This is particularly true in the Fourth Amendment context, where the constitutional standard of 'reasonableness' demands a fact-specific inquiry." (*Tarabochia v. Adkins* (9th Cir. 2014) 766 F.3d 1115, 1125 (*Tarabochia*).)

The Ninth Circuit Court of Appeals has defined the clearly established right in the context of claims of an unlawful detention and frisk in terms of the requirements established by *Terry*, *supra*, 392 U.S. at page 27, without incorporation of particular details. For example, in *Ramirez*, *supra*, 560 F.3d at page 1023, the Ninth Circuit stated, "At the time of Ramirez's pat-down, it was clearly established that every pat-down is unreasonable unless it is supported by the officer's reasonable suspicion that the person to be frisked is armed and dangerous." Similarly, in *Tarabochia*, *supra*, 766 F.3d at page 1125, the court framed the clearly established right as follows: "It was clearly established on the date of the automobile stop at issue here that the Tarabochias had a Fourth Amendment right not to be stopped by [Fish and Wildlife] officers while driving on a highway absent reasonable suspicion the Tarabochias had or were about to engage in unlawful activity." Accordingly, we reject the manner in which the state and Tawney have framed the clearly established right and utilize the formulation set forth in *Terry*,

*supra*, 392 U.S. at page 27, which was clearly established long before May 4, 2011, i.e., King had a right to be free from a frisk unless Tawney had specific, articulable facts providing him with a reasonable suspicion that King was armed or dangerous.

Here, viewing the evidence in the light most favorable to King, giving King the benefit of every favorable inference that may reasonably be drawn from the evidence, and resolving all conflicting evidence and inferences against Tawney and the state, we cannot conclude that, as a matter of law, the only reasonable conclusion legally deducible from the evidence is that Tawney had specific, articulable facts providing him with a reasonable suspicion that King was armed and dangerous. As previously addressed, honking the horn did not suggest that King was armed or dangerous, even if it created a risk that other people would arrive on the scene and that *those people* would create a risk of harm to the officers. Indeed, honking the horn suggested King was unarmed and vulnerable, and thus required assistance or witnesses. King testified he explained to Tawney that he had honked the horn because Tawney's conduct was frightening him and he wanted his father to come out of the house. The MVARS video demonstrated that King's purportedly loose clothing was actually quite ordinary and not unduly loose. Finally, the veracity of Tawney's claim that the presence of gangs in the area was a factor supporting a reasonable suspicion King was armed or dangerous was highly disputed. Tawney belatedly asserted this factor and could not name a single gang operating in the area. Moreover, he did not cite any factor about King, his vehicle, or the house where the SUV stopped as suggesting King was in a gang. The MVARS video enabled the jury to see that the neighborhood consisted of very ordinary, nonthreatening single family homes. No gang graffiti is depicted in the video, either in King's block or anywhere along the route taken by the patrol car.

Accordingly, given the standard of review necessitated by the posture in which the state and Tawney raised their qualified immunity claim, we cannot conclude that the evidence and reasonable inferences from the evidence, viewed in the light most favorable to King, permit only a single conclusion, i.e., that Tawney possessed specific, articulable

28

facts providing him with a reasonable suspicion that King was armed or dangerous. As the First Circuit Court of Appeals stated in reference to a claim of qualified immunity for an arrest, "[I]f what the policeman knew prior to the arrest is genuinely in dispute, and if a reasonable officer's perception of probable cause would differ depending on the correct version, that factual dispute must be resolved by a fact finder. [Citations.] [¶] . . . [W]e do not find the facts relative to probable cause to arrest, and the alleged related conspiracy, so plain as to lead us to only a single conclusion, i.e., a conclusion in defendants' favor. The facts are complex, intricate and in key areas contested. Even more important, the inferences to be drawn from the web of facts are disputed and unclear—and are likely to depend on credibility judgments." (*Prokey v. Watkins* (1st Cir. 1991) 942 F.2d 67, 73.) The state and Tawney were not entitled to JNOV on qualified immunity.

**5.      Exclusion of policy, practice, and procedure testimony by Sergeant Yox**

Tawney and the state contend that the trial court abused its discretion by excluding evidence of CHP policies and procedures and general police practices, specifically, the testimony of CHP Sergeant Scott Yox.[4] According to their expert designation, Yox "is an expert regarding the [CHP's] basis for detention procedures. Officer Yox is expected to testify regarding the training, policies, practices, and procedures of the CHP regarding the legal basis for stops as well as cursory/frisk/pat searches. Sergeant Yox is expected to provide opinions regarding the incident at issue in this lawsuit and the actions of those involved."

King filed a motion in limine to exclude, inter alia, Yox's testimony on the grounds the declaration accompanying the expert designation did not comply with Code of Civil Procedure section 2034.260, the testimony of two of the CHP experts would be duplicative, and the testimony would be irrelevant and prejudicial and should be excluded

_____

[4] The state and Tawney designated another policy and practice expert, but concede exclusion of his testimony was not prejudicial. Accordingly, we address only the exclusion of Yox's testimony.

pursuant to Evidence Code section 352. In their opposition to the motion, the state and Tawney asserted, "Sergeant Yox will specifically testify regarding CHP procedures and the fact that the decision to conduct the stop and frisk of [King] under the circumstances conformed with CHP procedures and was reasonable."

The trial court excluded Yox's testimony. The court explained that, absent any argument by King that the officer's conduct violated CHP policy, any testimony that it did not violate such policies was irrelevant because conformity with CHP policies did not mean the officer acted constitutionally. The court further expressed a concern that the proposed testimony would invade the province of the jury.

### a.     Applicable legal principles

An expert witness's opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801.) Although otherwise admissible opinion evidence "is not objectionable because it embraces the ultimate issue to be decided by the trier of fact" (*id.*, § 805), an expert is not allowed "to testify to legal conclusions in the guise of expert opinion. Such legal conclusions do not constitute substantial evidence. [Citation.] 'The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion.'" (*Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841.)

We review the trial court's ruling on the admissibility of expert opinion evidence for abuse of discretion. (*Amtower v. Photon Dynamics*, *Inc.* (2008) 158 Cal.App.4th 1582, 1599.)

### b.     The trial court did not err by excluding Yox's testimony

King did not contend that the officers failed to comply with CHP policy, only that Tawney's conduct violated his constitutional rights. The constitutional reasonableness of the traffic stop and frisk did not depend upon compliance with CHP policy, practice, or procedure, but upon compliance with the *Terry* standard, as to which the jury was properly instructed. The jury had to determine whether Tawney complied with the *Terry* standard on the basis of the evidence regarding the incident itself. Expert opinion to the

effect that the stop and frisk conformed to CHP policy would have been irrelevant. Expert opinion to the effect that the stop and frisk were constitutionally reasonable would have been an impermissible legal conclusion. The trial court correctly excluded Yox's opinion testimony.

Tawney and the state argue that Yox's expert testimony was necessary to give "context about why an officer would perceive an act such as honking a horn as a threat, and to show that Officer Tawney's conduct was in accord with his training, CHP policy, and general police practices, and therefore reasonable and protected by qualified immunity." Tawney and Knauss testified why they viewed King's use of his car's horn as suggesting danger, and the logic of their reasoning was readily apparent. No expert testimony was necessary on that point. Qualified immunity was not before the jury, and therefore Yox's testimony was not relevant for that purpose either.

We further note that, notwithstanding the exclusion of Yox's testimony, the state and Tawney were able to introduce evidence of CHP policy and procedure through Tawney. His testimony on this point was arguably more persuasive than Yox's would have been because it addressed those aspects of his own training and knowledge that guided him in his decision to frisk King, rather than official policies and procedures with which Tawney might not have been familiar.

**6.     Sufficiency of evidence of Bane Act violation**

Tawney and the state contend that the jury's finding that Tawney violated the Bane Act must be reversed because the evidence was insufficient to show that Tawney's "'do something'" statement caused King to surrender a right or that Tawney intended the threat to cause King to surrender a right. They argue that both constitutional violations found by the jury occurred prior to, or were underway, when the threat was made, so "[n]o additional rights could have been violated by the threat," and "King did not present any evidence that there was some action he would have taken but for Officer Tawney's statement, or that he did act in a way he otherwise would not have."

31

King counters that his Bane Act cause of action was based on the improper traffic stop and improper frisk, as well as the threat during the frisk, and that these violations deprived him of his right to get out of his car with his children and groceries and go inside his home. He argued that theory in the trial court with respect to the other theory underlying his Bane Act claim, that Tawney committed acts of violence against him: "Officer Tawney prevented Mr. King from getting his groceries out of the car, getting his daughters out of the car, and walking into his house. He prevented his free exercise to do that by the acts that he committed that day." In contrast, he argued with respect to the "threats of violence" theory, "That is the whisper into the ear, do something. That is a threat that if he did something, it would escalate. And he would be harmed. And that was the fear that Mr. King had when it was whispered to him."

The jury based its Bane Act finding exclusively on a threat of violence by Tawney that caused King "to reasonably believe that if he exercised his right to be free from an unlawful detention or search Officer Tawney would commit violence against him." The jury found Tawney did not commit an act of violence against King.

### a. Applicable legal principles

The Bane Act permits an individual to pursue a civil action for damages where another person "interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." (Civ. Code, § 52.1, subd. (a).) "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threat[], intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." (*Austin B.*, *supra*, 149 Cal.App.4th at p. 883.)

A person who is subjected to an unconstitutional detention, arrest, or search does not have a right to use force to resist that constitutional violation. (*Evans v. City of*

32

*Bakersfield* (1994) 22 Cal.App.4th 321, 332–333.) "While society has an interest in securing for its members the right to be free of unreasonable searches and seizures, society also has an interest in the orderly resolution of disputes between its citizens and the government. [Citation.] Given such competing interests, we opt for the orderly resolution through the courts over what is essentially 'street justice.'" (*Id.* at p. 332.)

**b.      The evidence is insufficient to support the jury's finding Tawney violated the Bane Act**

King did not testify that Tawney's threat caused him to do anything or refrain from doing anything, only that it caused him fear. As the state and Tawney correctly argue, the unlawful traffic stop had already been made and the unlawful search was underway when Tawney made the statement the jury concluded was a threat of violence. If King were entitled to use reasonable force to resist the unlawful frisk, perhaps the threat could be deemed as causing him to give up his right of resistance. However, because he had no such right to resist the unconstitutional frisk, the threat did not itself interfere with King's exercise or enjoyment of his constitutional rights. Similarly, Tawney cannot have been found to have intended the threat to cause King to relinquish his nonexistent right of resistance.

Accordingly, we agree with the state and Tawney that the jury's findings on the Bane Act cause of action are not supported by substantial evidence and reverse the judgment with respect to that cause of action only.

**7.      Purportedly inconsistent verdicts**

In their motion for a new trial, Tawney and the state challenged all of the damages as excessive. With respect to the jury's award of $138.03 in economic damages, they argued the "excessiveness" stemmed from its inconsistency with the jury's findings that Tawney did not use excessive force, commit battery or an act of violence, or "'negligently squeeze, twist and/or pull back'" King's wrists. They argued the unlawful stop, unlawful frisk, and threat of violence did not support an award of medical expenses.

33

The trial court denied the motion and adopted its tentative ruling, which stated: "The Court does not find the jury's award of $138.03 to be excessive or inherently inconsistent with its other decisions. The jury found that there was an unlawful stop and an unlawful pat-down. There was evidence presented that as a result of the stop and pat-down Plaintiff visited his doctor for wrist pain. The jury could have found that the costs of the medical visit flowed from the unlawful stop and pat-down. The evidence was uncontradicted that Tawney had physical contact with Plaintiff, including with Plaintiff's hands or wrist. Although the jury did not find that Tawney used excessive force, committed an act of violence, or negligently squeezed, twisted and pulled back Plaintiff's wrist, those findings are not inconsistent with the award of $138.03 in economic damages."

Tawney and the state contend that the trial court erred by denying their motion for a new trial with respect to the jury's award of $138.03 in economic damages. They argue the verdicts were irreconcilably inconsistent and necessitate a new trial.

### a.    Applicable legal principles

"[A] trial judge is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal." (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871–872.) "The general rule [is] that when the trial judge has passed on the issue of excessive damages in connection with a motion for new trial, his conclusion in the matter will not be disturbed unless it is clearly wrong." (*Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 492.) "The amount of damages is a fact question, committed first to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. [Citations.] All presumptions favor the trial court's ruling, which is entitled to great deference because the trial judge, having been present at trial, necessarily is more familiar with the evidence and is bound by the more demanding test of weighing conflicting evidence rather than our standard of review under the substantial evidence rule." (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078.)

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357–358, fn. omitted.) "On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] With a special verdict, . . . a reviewing court will not infer findings to support the verdict. [Citations.] ""Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.'" [Citations.]'" (*Id.* at p. 358.)

### b. The jury's findings were not irreconcilably inconsistent

The jury was not instructed that it could award medical damages only if it concluded King had been physically injured and Tawney had committed battery or an act of violence, or negligently squeezed, twisted and/or pulled King's wrists. The instructions instead told the jury that elements of both the "civil rights" and Bane Act causes of action were that King was "*harmed*" and Tawney's conduct was "a substantial factor in causing Jonte King's *harm*." (Italics added.) With respect to awarding damages, the jury was instructed: "If you decide that Jonte King has proved his claim against Officer Benjamin Tawney you also must decide how much money will reasonably compensate Jonte King for the *harm*. This compensation is called damages. [¶] The amount of damages must include an award for each item of *harm* that was *caused by Officer Benjamin Tawney's wrongful conduct*, even if the particular harm could not have been anticipated." (Italics added.) The jury was then instructed regarding economic and noneconomic damages. With respect to economic damages, the jury was specifically told: "The following are the specific items of economic damages claimed by

35

Jonte King:  [¶]  The parties stipulate that Mr. King incurred the following costs from Axminster Medical Group:  $138.03 due to his injuries he claimed to have sustained in this matter."

Given the instructions, which the state and Tawney do not challenge on appeal, the jury's award of King's medical expenses as economic damages was not irreconcilably inconsistent with its findings regarding excessive force, violence, battery, and negligence. As the trial court explained in its denial of the new trial motion on this point, it was undisputed that Tawney grabbed and held King's hands and wrists.  The parties stipulated that King incurred the medical costs for injuries he claimed to have sustained.  The jury found King was harmed by the unconstitutional traffic stop and frisk, and the damages instructions were similarly framed in terms of "harm" and compensating King for "each item of *harm* that was *caused by Officer Benjamin Tawney's wrongful conduct.*"  The jury could have concluded King's visit to his doctor was an "item of harm" that flowed from Tawney's wrongful stop and frisk.  The award of medical damages may have been legally unwarranted, but, given the instructions, it was not a finding that contradicted the jury's remaining findings and cast doubt upon the validity of the jury's reasoning.  (Cf. *Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 973 [jury found for mechanic and against injured child, yet awarded child's parent medical expenses incurred for treating injured child]; *Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 717–722 [jury in products liability action found product was not defective with respect to warnings, but defendant was negligent for failure to warn].)

Accordingly, we reject the attempt by Tawney and the state to obtain a new trial on the basis of a verdict the jury logically reached under the instructions it was given.

## 8.      Denial of Bane Act civil penalty

In his cross-appeal, King contends that the trial court erred by denying his claim for a civil penalty on his Bane Act claim.  Given our reversal of his Bane Act claim, his cross-appeal is moot.

## DISPOSITION

The judgment is reversed with respect to the Bane Act cause of action only and is otherwise affirmed.  King is awarded his costs with respect to the appeal.  King's cross-appeal is dismissed as moot, and each party shall bear their own costs with respect to the cross-appeal.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.