Filed 11/18/22  Montano v. Davila CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CLAUDIA MONTANO,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>ELSA DAVILA et al.,<br><br>   Defendants and Appellants. | B311432<br><br>(Los Angeles County<br>Super. Ct. No. BC695708) |

APPEAL from the judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

The Milner Firm and Timothy V. Milner for Defendants and Appellants.

Gordon Law, Donald Scott Gordon, and Justin Michael Gordon for Plaintiff and Respondent.

* * * * * *

A prospective buyer of a commercial building sued the prospective sellers for breach of contract and fraud, and was awarded actual and punitive damages exceeding $200,000 after a multi-day bench trial. The prospective sellers challenge this award, as well as the court's rejection of their cross-claims. We conclude there was no error, and affirm.

FACTS AND PROCEDURAL BACKGROUND

## I. Facts

### A. *The building*

In 2017, Elsa Davila (Davila) and Jesus Tapia (Tapia) (collectively, owners) owned a commercial building on Washington Boulevard in Culver City, California. The primary tenant in the building was the El Alteno Sports Bar (the Bar).

Claudia Montano (plaintiff) wanted to the buy the Bar, and she spoke with the Bar's owner about buying the Bar as well as with the owners about buying the building housing the Bar.

### B. *Plaintiff signs an agreement to buy the building*

Plaintiff and the owners eventually negotiated a Purchase Agreement (the Agreement) for plaintiff to buy the building. Plaintiff's purchase price under the Agreement was $1.5 million. The owners agreed to finance plaintiff's purchase as follows:

- Plaintiff would pay the owners a $75,000 down payment, and an additional $25,000 lump sum payment within six months.

- Plaintiff would pay the owners a monthly payment toward the outstanding balance. The initial monthly payment was $6,100 (the sum of the Bar's $3,100 monthly rent plus $3,000 from plaintiff), but the payment would rise to $8,000 once the tenant ended the lease.

2

- After two years, plaintiff would be able to obtain a bank loan to pay the owners the remaining balance.
- The owners would hold the deed until the full $1.5 million purchase price was paid in full.

Under the Agreement, plaintiff would be responsible for taking care of the building, for supervising the tenant, and for paying all property taxes.

The Agreement also had the following, somewhat unusual provision:

> "In the event a separate party *happens to offer* [the owners] more than [$1.5 million] for the property it is agreed to give [plaintiff] priority to pay remaining debt within 60 days. If [plaintiff] is unable to pay remaining debt within 60 days and [the owners] are able to sell the property, they will reimburse [plaintiff] all previous debt that was rendered to that point."

(Italics added.) During the period when the Agreement was negotiated, plaintiff was aware that the owners had listed the building for sale with a real estate agent. However, the owners assured plaintiff that their listing agreement had expired or was about to expire, and that they were not "actively marketing" the building for sale. Indeed, Davila acknowledged that this provision was meant to apply only "if by chance somebody came along and made an offer."

On the basis of the owners' representations, plaintiff signed the Agreement on November 4, 2017. Plaintiff thereafter made the $75,000 down payment, started making monthly payments, and paid the 2017 property tax bill for the building.

3

### C. *The owners' continued marketing of the building, sale to a third party, and rescission of the agreement*

Unbeknownst to plaintiff, the owners' listing agreement was not about to expire, and the owners continued to actively market the building through their listing agent. On January 29, 2018, the owners signed a contract to sell the building for exactly $1.5 million to an entity called "I'm For Real Estate, LLC."

On February 20, 2018,[1] the owners (through their lawyer) sent plaintiff a letter (1) expressing "serious doubts" as to whether the Agreement was "enforceable at all," and accusing plaintiff of engaging in elder abuse, and (2) "serv[ing] notice that they have received an offer" "for *more than* [$1.5 million]" (which, as noted above, is inaccurate), and demanding that plaintiff had 60 days (until April 21, 2018) to pay the nearly $1.4 million remaining balance if she wanted to buy the building. (Italics added.)

On March 23, 2018—just 31 days later—the owners sent plaintiff a second letter informing her that the Agreement was "rescinded" and refunding her the amounts she had paid under the Agreement, which the owners calculated to be $88,455.90.

On April 5, 2018, plaintiff sent a letter to the owners, their listing agent, and the third parties in control of the "I'm For Real Estate, LLC." In the letter, plaintiff refused to rescind the Agreement, informed the owners she was suing them for civil

---

1   The court and the parties refer to an earlier, February 2, 2018 letter in which the owners purported to cancel the Agreement. However, the letter is not in the record and, in light of our analysis, the letter would at most provide an alternate route to affirmance; we need not address this alternate route.

4

fraud, and indicated she had filed a report with the police regarding possible criminal fraud.

## II.    Procedural Background

### A.    *Plaintiff sues*

In February 2018, plaintiff sued the owners.  In the operative third amended complaint, plaintiff sued for (1) breach of contract, alleging that the owners' letters repudiated the Agreement by not giving her the full 60 days to pay the outstanding balance, (2) fraud, alleging in pertinent part that the owners had fraudulently induced her to sign the Agreement by concealing that they were going to continue actively marketing the building, (3) quiet title, alleging that the Agreement entitled her to ownership of the building, and (4) specific performance, alleging that the Agreement obligated the owners to convey her the building.

### B.    *The owners counter-sue*

The owners sued plaintiff (1) to quiet title to the building, (2) for slander of title based on her April 5 letter to the third party buyer, (3) for intentional interference with a contractual relation based on the same April 5 letter, (4) for rescission of the Agreement, (5) for elder abuse based on Tapia's age and illness at the time the Agreement was signed, and (6) for injunctive relief to prevent plaintiff from further contacting the third party buyer.

### C.    *Trial*

The matter proceeded to a multi-day bench trial in October 2019; the parties called nine witnesses.

The trial court issued its tentative statement of decision in February 2020.  The court found that the owners had breached the Agreement by declaring it to be "rescind[ed]" just 31 days after informing plaintiff she had 60 days to pay the outstanding

5

balance, but found that the contract was not "specifically certain" enough to support the remedy of specific performance.  The court also found by clear and convincing evidence that the owners had induced plaintiff to enter into the Agreement by telling the "explicit lie[]" that their listing agreement was about to expire while concealing that they were "going to actively sell the [building]."  The court rejected plaintiff's quiet title claim.  The court concluded that plaintiff had suffered $81,483.27 in actual damages, comprised of the amount of rent she would have been allowed to collect from the tenant for 18 months, out-of-pocket expenses of $15,227.37, the property tax bill she paid of $1,455.90, and $9,000 in labor expenses.  The court also found by clear and convincing evidence that the owners were "guilty of oppression, fraud or malice" because they had "manipulat[ed]" plaintiff into signing the Agreement so they could "receive a stream of income while deceitfully continuing to market the property"; the court accordingly awarded an additional $163,000 in punitive damages.  The court rejected the owners' remaining counterclaims, finding that they had not established any damages to support their slander of title and intentional interference claims, that injunctive relief was not a separate cause of action, and that they had not established the cause of action for recission.[2]

The court issued its final statement of decision in January 2021, adding $12,323.07 in prejudgment interest.

### D.  *Appeal*

The owners appealed the tentative statement of decision, but we dismissed their appeal as improper.

---

[2]     At trial, the owners had moved to dismiss the cause of action for elder abuse.

6

The owners then timely filed an appeal of the final statement of decision, which is before us now.

## DISCUSSION

The owners argue that the trial court erred in (1) ruling in plaintiff's favor on her breach of contract and fraud claims, and (2) ruling against them on the slander and intentional interference cross-claims. The sole challenge the owners bring is to the sufficiency of the evidence. As to the trial court's rulings on plaintiff's claims (that is, on plaintiff's breach of contract and fraud claims), we review those rulings for substantial evidence, asking whether the evidence in the record—when viewed in the light most favorable to the trial court's findings—supports those findings. (*King v. State of California* (2015) 242 Cal.App.4th 265, 278-279.) As to the trial court's rulings on the owners' claims (that is, on their claims for slander of title and intentional interference), we also review those rulings for substantial evidence, but because the owners had the burden of proof below, we may overturn the trial court's findings only if "'the evidence compels a finding in favor of [the owners] as a matter of law.'" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.)

## I. Plaintiff's Claims

### A. *Breach of contract*

The owners argue that they should not be liable for breaching the Agreement because plaintiff did not satisfy one of the preconditions to enforcing the Agreement—namely, paying the outstanding balance of the purchase price within 60 days of being told the owners had received an offer to buy the property that exceeded $1.5 million. (Accord, *Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1337-1338 [a buyer's failure to pay money

7

due under a contract justifies the seller terminating that contract].)

We reject the owners' argument.

To prevail on a breach of contract claim, a plaintiff must prove "(1) the existence of [a] contract, (2) plaintiff's performance or *excuse for nonperformance*, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821, italics added.) Here, and contrary to what the owners argue, plaintiff's failure to pay the outstanding balance is "excused." As the owners' February 20, 2018 letter stated (and even if we ignore that third party offer here was for *exactly* $1.5 million rather than "more than" $1.5 million), plaintiff was not obligated to "perform" by paying the outstanding balance until April 21, 2018. Prior to that date, however, the owners sent their March 23, 2018 letter "rescind[ing]" the Agreement and refunding plaintiff all of her payments under the Agreement. This letter—sent while plaintiff still had 29 days left to pay—constituted an express repudiation of the Agreement. (*Ferguson v. City of Cathedral City* (2011) 197 Cal.App.4th 1161, 1168 (*Ferguson*).) Because a repudiation "discharge[s] the other party's duties to render performance" (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 514; *Ferguson*, at p. 1168; *Alphonzo E. Bell Corp. v. Listle* (1946) 74 Cal.App.2d 638, 645), plaintiff was excused from making the payment of the outstanding balance and entitled to sue for breach of contract. Contrary to what the owners suggest, plaintiff's refusal to *accept* the owners' repudiation in her April 5, 2018 letter did not somehow negate that repudiation or obligate plaintiff to make payments on an Agreement the owners had by that time unequivocally repudiated.

8

**B.   *Fraud***

The owners argue that plaintiff did not adduce sufficient evidence of justifiable reliance or damages, thereby undermining any fraud damages and all punitive damages.

We reject the owners' argument.

To prevail on a claim based on fraud in the inducement of a contract, a plaintiff must prove (1) a "'misrepresentation ([that is, a] false representation, concealment, or nondisclosure),'" (2) "'knowledge of falsity (or "scienter"),'" (3) "'intent to defraud, i.e., to induce reliance,'" (4) "'justifiable reliance,'" and (5) "'resulting damage.'" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.)

Substantial evidence supports the trial court's finding that the owners falsely represented to plaintiff that their listing agreement was about to expire and that they would not be actively marketing the building, while concealing that their listing arrangement was going to continue.  Substantial evidence also supports the findings that plaintiff reasonably relied on those representations in deciding whether to enter into the contract because she so testified, and thereafter suffered damages by expending money and labor she would not have otherwise poured into the building but for the fraudulent misrepresentations and concealment.  Contrary to what the owners argue, whether plaintiff paid the outstanding balance within 60 days is irrelevant to her fraud claim, which turns on the owners' conduct in fraudulently inducing her into signing the Agreement in the first place.  The owners also argue that plaintiff did not take actions to protect herself, but that is also irrelevant to her fraud claim.

## II.    The Owners' Counter-Claims

The owners next argue that the trial court erred in rejecting their claims for slander of title and intentional interference with contractual relations.  Both claims require proof of damages.  (*Schep v. Capital One, N.A.* (2017) 12 Cal.App.5th 1331, 1336; *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55.)  At the conclusion of the bench trial, the owners conceded they had not proven any damages as to these claims.  This concession is fatal to their claims.  At oral argument, the owners urged that their attorney's concession was wrong and that there *was*, in fact, evidence of damages somewhere in the record (where in the record, they did not say).  This is too little, too late.  A party cannot concede elements of their claims before the trial court, and then turn around on appeal and argue for the first time that the concessions were wrong; this is classic sandbagging.

## III.    Sanctions

Plaintiff seeks sanctions of $56,355.72 against the owners for (1) filing the premature appeal from the initial statement of decision, and (2) filing what they believe to be a frivolous appeal from the final statement of decision solely for the purpose of delay.  We agree that the owners jumped the gun in filing their first appeal, and that their second appeal—for the reasons we have laid out above—lacks merit.  While the second appeal skirts dangerously close to the line that separates a meritless appeal from a frivolous appeal, it does not cross that line.  (See *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [sanctions are appropriate and appeal should be found to be frivolous only when "no reasonable attorney could have thought it meritorious."])  We accordingly decline to impose sanctions.

## DISPOSITION

The judgment is affirmed.  Plaintiff is entitled to her costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

11